Gary W. Jackson, NC Bar No. 13976
Thomas M. Wilmoth, NC Bar No. 41684
**LAW OFFICES OF JAMES SCOTT FARRIN**
555 South Mangum Street, Suite 800
Durham, NC 27284
Tel: (919) 688-4991
gjackson@farrin.com


*Appointed Interim Liaison Counsel for*
*Plaintiffs and the Class; Additional Attorneys*
*Listed on Signature Page*

## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF NORTH CAROLINA
## CHARLOTTE DIVISION

| | |
|---|---|
| IN RE: BANK OF AMERICA UNAUTHORIZED ACCOUNT OPENING LITIGATION | Case No. 3:23-cv-00422-MOC-DCK<br><br>**CONSOLIDATED CLASS ACTION COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

# TABLE OF CONTENTS

**Page**

I.      INTRODUCTION ...................................................................................................1

II.     JURISDICTION AND VENUE ...........................................................................2

III.    PARTIES ...............................................................................................................3

        A.    Defendant Bank of America, N.A. ...........................................................3

        B.    Plaintiffs ...................................................................................................4

              1.    Credit Card Class Plaintiffs ............................................................4

              2.    Accounts Class Plaintiffs ................................................................8

IV.     FACTUAL BACKGROUND ...............................................................................16

        A.    The Government's Investigation Uncovers the Motivation Behind Bank of America's Illegal Account Opening Practices and Problematic Incentive Program ...............................................................................................16

        B.    BoA's Faulty Account Opening Practices ..............................................19

              a.    Failure to Adequately Verify Customer Identities Before Opening Accounts ..........................................................................19

        C.    Failure to Obtain Consent to Run a Credit Report or to Open a Credit Card Account ...............................................................................................20

              a.    Failure to Perform Reasonable Diligence to Detect Unauthorized Accounts .........................................................................................21

        D.    BoA Concealed Its Unlawful Practices ..................................................22

        E.    BoA's Practices Caused Serious Harm to Plaintiffs and the Classes .....23

V.      TOLLING OF THE STATUTE OF LIMITATIONS ...........................................27

VI.     CLASS ACTION ALLEGATIONS .....................................................................28

VII.    CHOICE OF LAW FOR NATIONWIDE CLAIMS ............................................33

VIII.   CAUSES OF ACTION .........................................................................................34

        COUNT I
        Violations of the Fair Credit Reporting Act ("FCRA") On Behalf of the Credit Card Class ....................................................................................................34

COUNT II
    Negligence On Behalf of the Accounts Class and the State Accounts Subclasses...36

COUNT III
    Unjust Enrichment On Behalf of All Plaintiffs, All Classes, and All Subclasses ....37

COUNT IV
    Declaratory Relief On Behalf of All Plaintiffs, All Classes, and All Subclasses.....38

COUNT V
    North Carolina Unfair and Deceptive Trade Practices Act ("UDTPA"),
    N.C. Gen. Stat. Ann. §§ 75-1, *et seq.* On Behalf of Plaintiffs and the Accounts
    Class, or Alternatively, on Behalf of Plaintiffs and the Statewide North Carolina
    Subclass ................................................................................................................40

IX.    CLAIMS ON BEHALF OF THE CALIFORNIA ACCOUNTS SUBCLASS ................44

COUNT VI
    California Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §§ 17200,
    *et seq.* On Behalf of the California Plaintiff and the California Accounts
    Subclass ................................................................................................................44

X.    CLAIMS ON BEHALF OF THE ILLINOIS ACCOUNTS SUBCLASS........................48

COUNT IX
    Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA"),
    815 Ill. Comp. Stat. 505/1, *et seq.* On Behalf of the Illinois Plaintiff and the
    Illinois Accounts Subclass ....................................................................................48

XI.    CLAIMS ON BEHALF OF THE MINNESOTA ACCOUNTS SUBCLASS ................53

COUNT X
    Minnesota Consumer Fraud Act ("MCFA"), Minn. Stat. §§ 325F.68, *et seq.*
    and Minn. Stat. §§ 8.31, *et seq.* On Behalf of the Minnesota Plaintiff and the
    Minnesota Accounts Subclass ..............................................................................53

COUNT XI
    Minnesota Uniform Deceptive Trade Practices Act ("MUDTPA"), Minn. Stat.
    §§ 325D.43, *et seq.* On Behalf of the Minnesota Plaintiff and the Minnesota
    Accounts Subclass ................................................................................................57

XII.    CLAIMS ON BEHALF OF THE NEW JERSEY ACCOUNTS SUBCLASS ................61

COUNT XII
    New Jersey Unfair Trade Practices Act ("NJUTPA"), N.J. Stat. Ann. §§ 56:8-1,
    *et seq.* On Behalf of the New Jersey Plaintiff and the New Jersey Accounts
    Subclass ................................................................................................................61

XIII.  CLAIMS ON BEHALF OF THE NEVADA ACCOUNTS SUBCLASS ........................65

COUNT XIII
Nevada Deceptive Trade Practices Act ("NDTPA"), Nev. Rev. Stat. Ann.
§§ 598.0903, *et seq.* On Behalf of Nevada Plaintiffs and the Nevada Accounts
Subclass .................................................................................................................65

XIV.  PRAYER FOR RELIEF ...........................................................................................70

XV.  DEMAND FOR JURY TRIAL ..................................................................................71

Plaintiffs Gwenevere Alexander-Tell, Octavio Ayala, Nadine Ballard, Joseph Barlay, Andrew Beal, David Conaway, Miedo Donque, Benjamin Cox, Brigette Newby, Marvell Pamilton, Chad Powe, Cristel Rothwell, Robert Schak, and Jermaine Willis (collectively, "Plaintiffs"), individually and on behalf of all others similarly situated, file this Consolidated Class Action Complaint against Defendant Bank of America, N.A. ( "BoA" or the "Bank"). In support thereof, Plaintiffs state as follows:

## I.     INTRODUCTION

1.     For more than a decade, Bank of America opened accounts in the names of thousands of consumers who did not authorize the opening of those accounts. Those accounts were opened by Bank of America employees or its agents who were motivated by pressure and incentives from management to increase the number of Bank of America accounts. Consumers were often unaware of account openings until reviewing credit reports. But opening accounts has an impact on consumers, affecting their credit reports, imposing fees, and raising legitimate concerns about the safety of the personal information Bank of America is supposed to protect. This action seeks to make consumers whole for harm suffered as a result of Bank of America's actions.

2.     On July 11, 2023, the Consumer Financial Protection Bureau ("CFPB") issued a stipulated consent order ("Consent Order") against BoA for, among other things, (i) obtaining and/or using consumers' credit reports (and other sensitive customer information) without a permissible purpose, and (ii) opening credit cards, debit cards, and other non-credit accounts (checking and savings accounts, for example) without consumers' knowledge or consent. *See In the Matter of: Bank of America, N.A.*, No. 2023-CFPB-0007, Doc. 1 (July 11, 2023).

3.     The Consent Order made clear that from January 1, 2012 to the present ("Class Period"), BoA's illegal account opening practices were motivated by, and directly "in response to sales pressure" to "obtain incentive awards." *Id*. at ¶ 25.

4.     Importantly, while the Consent Order may remedy some of the harm for a limited number of BoA customers, it does not come close to providing a remedy for the spectrum of harms

experienced by Class Members. This action extends beyond the Consent Order, as it concerns both unauthorized credit accounts and unauthorized checking accounts and seeks to remedy broader harms. These include, but are not limited to, fees associated with both types of the unauthorized accounts; damage to consumers' credit scores as a result of the inclusion of unauthorized accounts on their credit reports; damage to their credit score from credit report draws; and lost time and effort spent investigating all unauthorized accounts, reporting issues to BoA, attempting to correct them, and attempting to mitigate further harm, including harm from potential identity theft, the loss of control over personal identifying information, and payment for credit monitoring and lock services.

5.     Plaintiffs bring this Consolidated Class Action Complaint, alleging violations of the Fair Credit Reporting Act ("FCRA"), common law theories of Unjust Enrichment, Negligence, and violations of various state Unfair and Deceptive Trade Practice laws. For purposes of this Complaint, "Plaintiffs" constitutes two separate classes: (1) Plaintiffs whose credit reports (or other sensitive customer information) were obtained and/or used by Bank of America or its agents without a permissible purpose and without their prior knowledge or authorization and/or individuals who the Bank opened a credit card product in their name without their prior knowledge or authorization ("Credit Card Class"), and (2) Plaintiffs who had debit cards, checking or savings accounts, or other non-credit products opened in their name by Bank of America or its agents without their prior knowledge or authorization ("Accounts Class"). All Plaintiffs seek actual damages, statutory damages, restitution, declaratory relief, and all other relief as this Court deems appropriate.

## II.     JURISDICTION AND VENUE

6.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 under the Fair Credit Reporting Act, 15 U.S.C. § 1681, *et seq.*

7.      This Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367 because the state law claims form part of the same case or controversy as those that give rise to the federal claims.

8.      In addition, this Court has subject matter jurisdiction over the Action pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d), because the amount in controversy exceeds $5,000,000, exclusive of interest and costs, and at least one Class Member is a citizen of a state different from Defendant.

9.      This Court has personal jurisdiction over BoA because BoA maintains its principal place of business in Charlotte, North Carolina. This Court also has personal jurisdiction over BoA because the events giving rise to this Action occurred in Charlotte, North Carolina. BoA has continuous and systematic contacts with the State of North Carolina, availing itself to the laws of North Carolina.

10.     Venue is proper in this Court under 28 U.S.C. § 1391, because BoA maintains its principal place of business in and is subject to personal jurisdiction in this District. Additionally, the conduct giving rise to the allegations and claims asserted in this Action originated and occurred in this District.

### III.      PARTIES

#### A.      Defendant Bank of America, N.A.

11.     Defendant Bank of America, N.A. is the second largest bank chartered under the laws of the United States with its principal place of business located at Bank of America Corporate Center, 100 N. Tryon Street, Charlotte, North Carolina 28255. BoA's "retail banking footprint covers all major markets in the U.S.," and serves "approximately 69 million consumer and small business clients with approximately 3,800 retail financial centers, approximately 15,000 ATMs,

and leading digital banking platforms (www.bankofamerica.com) with approximately 46 million active users, including approximately 38 million active mobile users."[1]

12.     BoA is a subsidiary of Bank of America Corp.[2]

**B.     Plaintiffs**

**1.     Credit Card Class Plaintiffs**

13.     The Credit Card Class Plaintiffs seek to represent the Credit Card Class which is comprised of individuals whose consumer credit reports or other sensitive consumer information were obtained and/or used by Bank of America or its agents without a permissible purpose and without the consumer's prior knowledge or consent, or individuals who the Bank opened a credit card product in their name without their prior knowledge or authorization.

14.     **Plaintiff Andrew Beal** is a resident of Layton, Utah. To his knowledge, Plaintiff Beal is not currently—and has never been—a BoA accountholder.

15.     In or around 2023, Plaintiff Beal received a letter from BoA containing a credit card registered in his name. Plaintiff Beal promptly contacted BoA to inform them he had not applied for a credit card account with BoA and requested they either waive the fees associated with the credit card or close the account. The BoA representatives dismissed Plaintiff Beal's assertions of BoA opening an unwanted credit card account in his name as fraud but were unable to produce a signed document or application for the credit card account from Plaintiff Beal. The BoA representatives informed Plaintiff Beal they would cancel the credit card account at his request.

16.     As a result of BoA's conduct, Plaintiff Beal suffered significant harm, including but not limited to unwarranted credit card fees, damage to his credit score associated with the opening and closing of the unauthorized credit card, the loss of control over personal identifying information, the expenditure of time and resources contending with and investigating the circumstances of the unauthorized credit card, the expenditure of time and resources monitoring

---

[1]     BoA Form 10-K for Fiscal Year Ended Dec. 31, 2023 (Feb. 20, 2024), https://investor.bankofamerica.com/regulatory-and-other-filings/all-sec-filings/content /0000070858-24-000122/bac-20231231.htm.
[2]     *Id.*

and assessing for credit issues and fraudulent activity, including but not limited to identity theft, and the adverse impact on his ability to obtain other credit products.

17.     **Plaintiff Miedo Donque** is a resident of Rancho Santa Margarita, California. Plaintiff Donque has been a BoA customer for 20 years, since approximately 2003 and has held a checking account, savings account, credit account, and home loan account during that time. He no longer maintains a credit account or a home loan account with BoA.

18.     On June 29 and July 19, 2021, Plaintiff Donque received notifications from BoA that he had a "new e-Bill" with a statement balance of $11.77 for a credit card that Plaintiff Donque did not open or authorize. Plaintiff Donque promptly contacted BoA to inform BoA that he did not open, authorize, nor have any knowledge of the unauthorized credit card account. In response, Plaintiff Donque expected BoA to immediately close the unauthorized account. However, BoA continued to seek payments from Plaintiff Donque for the unauthorized account. BoA sent Plaintiff Donque notifications on February 19, 2022, stating that a minimum payment of $25.00 was due, on May 29, 2022, stating that a *total* balance of $557.14 was due, and on July 19, 2022, stating that a minimum payment of $25.00 was due. Plaintiff Donque repeatedly informed BoA that he did not authorize nor otherwise ever use this unauthorized credit card account. Despite Plaintiff Donque's efforts, BoA continually sought payment from him by sending him emails stating that he had an overdue unpaid balance and requesting that he make minimum payments to pay down the overdue balance on the unauthorized account through and including July 19, 2022—more than *one year* after Plaintiff Donque requested the unauthorized account be closed. Plaintiff Donque did not receive notice from BoA about its settlement with the CFPB.

19.     Between July 19, 2022 and August 2022, BoA closed the unauthorized account.

20.     As a result of BoA's conduct, Plaintiff Donque suffered significant harm, including minimum payment charges associated with the unauthorized credit card and interest charges associated with the unauthorized credit card, damage to his credit score associated with the opening and closing of the unauthorized credit card, the loss of control over personal identifying

information, the expenditure of time and resources contending with and investigating the circumstances of the unauthorized credit card, the expenditure of time and resources monitoring for credit issues and fraudulent activity, including but not limited to identity theft, and the adverse impact on his ability to obtain other credit products.

21.    **Plaintiff Robert Schak** is a resident of Elk Grove Village, Illinois. Plaintiff was an accountholder with LaSalle Bank, which was acquired by Bank of America in approximately 2007.

22.    In or around October 2022, multiple (more than ten) credit card inquiries appeared on Plaintiff Schak's credit report. Several BoA credit cards were opened in Plaintiff Schak's name, which he did not apply for and which he never received. Those credit cards did, however, appear on Plaintiff Schak's credit report. The credit card accounts have been closed. Plaintiff Schak did not receive notice from BoA about its settlement with the CFPB.

23.    As a result of BoA's conduct, Plaintiff Schak suffered significant harm, including damage to his credit score associated with the opening and closing of the unauthorized credit cards, the loss of control over personal identifying information, the expenditure of time and resources contending with and investigating the circumstances of the unauthorized credit cards, the expenditure of time and resources monitoring and assessing for credit issues and fraudulent activity, including but not limited to identity theft, and the adverse impact on his ability to obtain other credit products.

24.    **Plaintiff Nadine Ballard** is a resident of Centerville, Ohio. Plaintiff Ballard has never been a customer of Bank of America.

25.    On or about March 17, 2023, Plaintiff Ballard received a notification on her credit monitoring software regarding an unknown inquiry. On April 6, 2023, Plaintiff Ballard received an email from Bank of America notifying her that a credit card was on its way to her. On April 7, 2023, Plaintiff Ballard received written correspondence along with an Allegiant World Mastercard.

26.    Plaintiff Ballard contacted Bank of America on April 25, 2023 to notify them of the fraudulent account opening and on April 25, 2023, Bank of America closed the financial

account. Plaintiff Ballard was also notified on June 5, 2023 by Allegiant that Allegiant had sent instructions to the credit reporting agencies for them to delete the March 16, 2023 inquiries made on Plaintiff Ballard's credit reports.

27.     In addition to her direct communications with Bank of America, Plaintiff Ballard filed two complaints with the CFPB on April 10, 2023 and July 4, 2023. During the course of the investigation of these Complaints, Plaintiff Ballard learned that Bank of America had opened an unauthorized credit card account in her name through an application for an Allegiant Vacation, LLC World Mastercard that was submitted without Plaintiff Ballard's knowledge or consent on or about March 16, 2023.

28.     Due to the unauthorized credit card being opened by BoA, Plaintiff Ballard has spent substantial time to correct her credit report as well as to lodge complaints with the appropriate government agencies, including the CFPB.

29.     As a result of BoA's conduct, Plaintiff Ballard suffered significant harm, including damage to her credit score associated with the opening and closing of the unauthorized credit card, the loss of control over personal identifying information, the expenditure of time and resources contending with and investigating the circumstances of the unauthorized credit card, the expenditure of time and resources monitoring and assessing for credit issues and fraudulent activity, including but not limited to identity theft, and the adverse impact on her ability to obtain other credit products.

30.     **Plaintiff Octavio Ayala** is a resident of Las Vegas, Nevada. Plaintiff Ayala is not currently—and has never been—a BoA accountholder.

31.     In or around 2019, BoA denied Plaintiff Ayala's application to open a checking account. Upon investigating the matter, Plaintiff Ayala discovered that an unauthorized BoA credit card account had been opened in his name and that such unauthorized account had been the reason for his application's denial.

32.     Upon further investigation and after filing complaints with the CFPB, Plaintiff Ayala discovered that BoA had mailed the unauthorized credit card to a PO Box in violation of federal law and regulation.

33.     Plaintiff Ayala was charged fees and interest for the unauthorized credit card account's delinquent status.

34.     On or around August 9, 2024, at Plaintiff Ayala's behest and after being notified of Plaintiff Ayala's complaints with the CFPB, BoA closed the unauthorized credit card account and—to Plaintiff Ayala's surprise—other unauthorized BoA accounts that Plaintiff Ayala was unaware of and never authorized.

35.     As a result of BoA's conduct, Plaintiff Ayala suffered significant harm, including damage to his credit score associated with the opening and closing of the unauthorized credit card, the loss of control over personal identifying information, the expenditure of time and resources contending with and investigating the circumstances of the unauthorized credit card, the expenditure of time and resources monitoring and assessing for credit issues fraudulent activity, including but not limited to identity theft, and the adverse impact on his ability to obtain other credit products.

## 2.     Accounts Class Plaintiffs

36.     The Accounts Class Plaintiffs seek to represent the Accounts Class which is comprised of individuals who had debit cards, checking or savings accounts, or other non-credit products opened in their name by Bank of America or its agents without their prior knowledge or authorization.

37.     **Plaintiff Jermaine Willis** is a resident of Rancho Cucamonga, California. Plaintiff Willis has been a client of Bank of America on and off since approximately 2006.

38.     In 2018, Plaintiff Willis closed a checking account that he had with BoA. In 2022, Plaintiff Willis learned of an unauthorized opening of a checking account in his name at BoA. Plaintiff Willis believes that the unauthorized account was opened in or about 2021. When Plaintiff

Willis learned of the unauthorized account in 2022, the account already had a negative balance as a result of the imposition of nonsufficient funds ("NSF") fees for failure to maintain minimum account balances.

39.     As a result of BoA's conduct, Plaintiff Willis suffered significant harm, including fees for failure to maintain a minimum account balance, damage to his credit score associated with the opening and closing of the unauthorized credit card, the loss of control over personal identifying information, the expenditure of time and effort contending with and investigating the circumstances of the unauthorized credit card, the expenditure of time and resources monitoring and assessing for credit issues and fraudulent activity, including but not limited to identity theft, and the adverse impact on his ability to obtain other credit products.

40.     **Plaintiff Cristel Rothwell** is a resident of Jacksonville, Florida. Plaintiff Rothwell is not currently a BoA customer. Plaintiff Rothwell previously had a checking account that she closed in 1999.

41.     In 2022, Plaintiff Rothwell received notice of the unauthorized opening of a checking account in her name at BoA. Plaintiff Rothwell learned of the unauthorized account after receiving an email from BoA thanking her for opening and changing the email associated with the account. Plaintiff Rothwell did not authorize the opening of this checking account. Plaintiff Rothwell believes that the unauthorized account was opened in or about August 2022.

42.     When Plaintiff Rothwell learned of the unauthorized account in 2022, she notified Bank of America and requested closure of the unauthorized account. Plaintiff Rothwell spent around five (5) hours total speaking to BoA representatives over the phone and filing a police report to close the unauthorized account. Plaintiff Rothwell also spent approximately $30.00 to send requested materials to the BoA Fraud Department to prove that the account was fraudulent.

43.     BoA conceded in 2022 that Plaintiff Rothwell did not open the account. In December of 2022, the unauthorized account was closed.

44.     As a result of BoA's conduct, Plaintiff Rothwell suffered significant harm, including damage to her credit score associated with the opening and closing of the unauthorized account, the loss of control over personal identifying information, the expenditure of time and resources contending with and investigating the circumstances of the unauthorized account, the expenditure of time and resources monitoring and assessing for credit issues and fraudulent activity, including but not limited to identity theft, and the adverse impact on her ability to obtain other credit products.

45.     **Plaintiff Chad Powe** is a resident of Loganville, Georgia. Plaintiff Powe has had a checking account with BoA since approximately 2021. Previously, Plaintiff Powe had a checking account with BoA between approximately 2000 and 2005.

46.     In approximately May or June of 2020, Plaintiff Powe learned of a checking account opened in his name, that he did not authorize. He learned of the unauthorized checking by checking his Norton 360 credit monitoring account. Plaintiff Powe learned that the account had a negative balance resulting from the imposition of account fees ("NSF") charges as a result of failing to meet minimum account balance requirements. Plaintiff Powe personally visited a BoA branch office to close the unauthorized account, after which representatives of BoA acknowledged that the account appeared to be fraudulent.

47.     Plaintiff Powe believes and is informed that the unauthorized checking account appears on his credit report and that he has sustained damage as a result of the unauthorized checking account and resulting negative balance in this unauthorized checking account.

48.     As a result of BoA's conduct, Plaintiff Powe suffered significant harm, including damages from minimum balance fee charges, being denied the ability to open either checking or savings accounts at several institutions, including USAA, Truist Bank, and Regions Bank, damage to his credit score associated with the opening and closing of the unauthorized account, the loss of control over personal identifying information, the expenditure of time and resources contending with and investigating the circumstances of the unauthorized account, the expenditure of time and

resources monitoring and assessing for credit issues and fraudulent activity, including but not limited to identity theft, and the adverse impact on his ability to obtain other credit products.

49.     **Plaintiff Gwenevere Alexander-Tell** is a resident of Mounds View, Minnesota. Plaintiff Alexander-Tell is not currently a customer, and has never been a customer, of Bank of America.

50.     On May 8, 2022, Plaintiff Alexander-Tell learned of the unauthorized opening of a checking account in her name at BoA. Plaintiff Alexander-Tell received an email from BoA that a deposit account was opened in her name. As soon as Plaintiff Alexander-Tell learned of the unauthorized account in May 2022, she immediately requested the closure of the account.

51.     BoA conceded on October 25, 2022 that Plaintiff Alexander-Tell did not open the account. On October 25, 2022, BoA closed the unauthorized account.

52.     In or around Mach 2023, Plaintiff Alexander-Tell filed a complaint against BoA with the CFPB.

53.     As a result of BoA's conduct, Plaintiff Alexander-Tell suffered significant harm, including damage to her credit score associated with the opening and closing of the unauthorized account, the loss of control over personal identifying information, the expenditure of time and effort contending with and investigating the circumstances of the unauthorized account, the cost, including the expenditure of time and effort, of monitoring and assessing for fraudulent activity, and the adverse impact on her ability to obtain other credit products.

54.     **Plaintiff Joseph Barlay** is a resident of Somerset, New Jersey. Upon information and belief, Plaintiff Barlay has been a checking and savings account customer of BoA since 2008.

55.     On April 1, 2023, Plaintiff Barlay learned of the unauthorized opening of a checking account in his name at Bank of America. Plaintiff Barlay believes that the unauthorized account was opened in or about 2023. When Plaintiff Barlay learned of the unauthorized account in 2023, he requested that Bank of America close the unauthorized account. Plaintiff Barlay spent

several hours over the course of four (4) months speaking to BoA representatives over the phone to try to close the account.

56.     Defendant conceded on August 14, 2023 that Plaintiff Barlay did not open the account. BoA closed the unauthorized account on that day.

57.     As a result of BoA's conduct, Plaintiff Barlay suffered significant harm, including damage to his credit score associated with the opening and closing of the unauthorized account, the loss of control over personal identifying information, the expenditure of time and resources contending with and investigating the circumstances of the unauthorized account, the expenditure of time and resources monitoring and assessing for credit issues and fraudulent activity, including but not limited to identity theft, and the adverse impact on his ability to obtain other credit products.

58.     **Plaintiff Marvell Pamilton** is a resident of Las Vegas, Nevada. Plaintiff Pamilton was a BoA client, having had until August 2024 two checking accounts and one savings account with the Bank.

59.     On or around August 2024, Plaintiff Pamilton sought to open a new BoA account and was declined by BoA and informed that one of his accounts reflected an owed balance of $1,600.

60.     Upon reviewing his credit report shortly thereafter, Plaintiff Pamilton discovered that the report disclosed six BoA accounts, three of which he did not recognize and never authorized. These three unauthorized accounts were checking and savings accounts reportedly opened in 2018 and 2019.

61.     Plaintiff Pamilton believes and is informed that BoA closed the unauthorized accounts along with his three legitimate accounts on or around August 2024.

62.     Also around this time, U.S. Bank informed Plaintiff Pamilton that ChexSystems had flagged issues that suggested he posed risks to the bank and that the bank would proceed to close the checking and savings accounts Plaintiff Pamilton had with the bank.

63.     As a result of BoA's conduct, Plaintiff Pamilton suffered significant harm, including damage to his credit score associated with the opening and closing of the unauthorized account, the loss of control over personal identifying information, the expenditure of time and resources contending with and investigating the circumstances of the unauthorized account, the expenditure of time and resources monitoring and assessing for credit issues and fraudulent activity, including but not limited to identity theft, and the adverse impact on his ability to obtain other credit products.

64.     **Plaintiff Brigette Newby** is a resident of Benton, New Hampshire. Plaintiff Newby is a former BoA client, having had a joint checking account with the Bank between 2001 and 2005.

65.     On or around August 2022, a local bank denied Plaintiff Newby's application for the opening of an account after ChexSystems flagged her application. Upon investigating the matter, Plaintiff Newby discovered that the flag was connected to two BoA personal loans which had been opened without her consent. By the time she discovered the accounts' existence, one of them reflected a negative balance of $2,524.

66.     These accounts were tied to an address in California that Plaintiff Newby did not recognize and which she never previously occupied.

67.     Plaintiff Newby was charged fees for holding a negative account balance.

68.     Promptly after learning about the unauthorized accounts' existence and following a day's worth of effort on the phone with BoA, Plaintiff Newby was transferred to the right department and was finally able to close the unauthorized personal loan accounts. BoA sent her an email confirming the closures.

69.     In discussions with BoA, Plaintiff Newby discovered that the unauthorized personal loan accounts were opened in March 2022.

70.     Plaintiff Newby believes and is informed that the unauthorized personal loan accounts appear on her credit report and that she has sustained damage as a result of the unauthorized accounts and the negative balance associated with those accounts.

71.     As a result of BoA's conduct, Plaintiff Newby suffered significant harm, including damages from fees associated with the unauthorized accounts and from having a negative account balance, damage to her credit score associated with the opening and closing of the unauthorized accounts, the loss of control over personal identifying information, the expenditure of time and resources contending with and investigating the circumstances of the unauthorized accounts, the expenditure of time and resources monitoring and assessing for credit issues and fraudulent activity, including but not limited to identity theft, and the adverse impact on her ability to obtain other credit products.

72.     **Plaintiff Benjamin Cox** is a resident of Kinston, North Carolina. Plaintiff Cox previously had a savings account with Bank of America that he closed in 2020.

73.     In or about 2019, Plaintiff Cox was made aware of a checking account opened in his name at BoA. When he learned of the unauthorized checking account, it already had a negative balance as a result of fees assessed by BoA as a result of not meeting minimum account balance requirements. Plaintiff Cox was charged fees for holding a negative account balance. Plaintiff Cox attempted to close the unauthorized account online, but was told that he could only do so at a BoA branch. Thereafter, Plaintiff Cox went to a BoA branch and closed the unauthorized account.

74.     Plaintiff Cox believes and is informed that the unauthorized checking account appears on his credit report and that he has sustained damage as a result of the unauthorized checking account and resulting negative balance in this unauthorized checking account.

75.     As a result of BoA's conduct, Plaintiff Cox suffered significant harm, including damage to his credit score associated with the opening and closing of the unauthorized account, the loss of control over personal identifying information, the expenditure of time and resources contending with and investigating the circumstances of the unauthorized account, the expenditure of time and resources monitoring and assessing for credit issues and fraudulent activity, including but not limited to identity theft, and the adverse impact on his ability to obtain other credit products.

76.     **Plaintiff David Conaway** is a resident of Williamsburg, Virginia. Plaintiff Conaway has been a customer of BoA since around 2007 when he first opened checking and savings accounts. Since that time, he has also opened a credit card with BoA. In or around 2018, Plaintiff Conaway opened a business account with BoA. These accounts remain open.

77.     On September 6, 2022, Plaintiff Conaway became aware that BoA had opened an unauthorized checking account in his name after he received an email stating that his application had been approved and he had a new account opened. When Plaintiff Conaway logged into his BoA online banking portal, he could see that a new account had been opened in his name and without his authorization or consent. Plaintiff Conaway immediately contacted BoA upon seeing this new account displayed on his online banking portal. Plaintiff Conaway was initially told that he was likely a victim of fraud, but another representative later told him that BoA was the victim of a data breach. Plaintiff Conaway was assured that the account was "locked" and no money could be transferred in or out. After talking with BoA representatives, Plaintiff Conaway attempted to transfer money into and out of the new checking account to ensure that it was "locked" as he had been advised. Upon doing so, Plaintiff Conaway discovered that the transfers were successful – meaning that the account was not locked.

78.     Plaintiff Conaway made at least five phone calls to BoA and traveled to the nearest BoA branch to speak with a manager about the checking account. It took about two weeks for BoA to finally close the account.

79.     Plaintiff Conaway was originally told by a BoA representative that he was a victim of fraud. Another BoA representative told him that BoA had suffered a data breach. This misinformation prevented Plaintiff Conaway from taking action that may have resolved his predicament sooner.

80.     As a result of BoA's conduct, Plaintiff Conaway suffered significant harm, including damage to his credit score associated with the opening and closing of the unauthorized account, the loss of control over personal identifying information, the expenditure of time and

resources contending with and investigating the circumstances of the unauthorized account, the expenditure of time and resources monitoring and assessing for credit issues and fraudulent activity, including but not limited to identity theft, and the adverse impact on his ability to obtain other credit products.

## IV.     FACTUAL BACKGROUND

### A.     The Government's Investigation Uncovers the Motivation Behind Bank of America's Illegal Account Opening Practices and Problematic Incentive Program

81.     On July 11, 2023, the CFPB issued a stipulated Consent Order against BoA for, among other things, (i) obtaining and/or using consumers' credit reports (and other sensitive customer information) without a permissible purpose, and (ii) opening credit cards, debit cards, and other non-credit accounts (checking and savings accounts, for example) without consumers' knowledge or consent. According to the Government, the Bank's illegal account opening practices derive from a problematic incentive program the Bank implemented.

82.     Beginning in 2012, BoA implemented a sales incentive program that tied compensation for its management and employees to the number of new banking products or services that were opened or used by the consumer, rewarding them when they met sales goals for opening new accounts. In simpler terms, the more accounts that BoA staff opened, the more they were paid.

83.     In addition to compensation, the sales metrics were also used to evaluate employees' overall performance and assess whether disciplinary actions were needed. Sales metrics were even considered when making scheduling determinations. BoA held weekly meetings where sales quotas were reviewed and employees would be scrutinized for not meeting their sales goals.

84.     BoA's sales targets and compensation incentives created high-pressure sales expectations, which led employees to go to great lengths to achieve their targets. This included illegally opening accounts without Plaintiffs' and Class Members' knowledge or consent,

burdening Plaintiffs and Class Members with needless debt and fees. At the same time, BoA's executives were rewarded for reaching sales metrics.

85. BoA financial center employees were evaluated for performance and incentive compensation based in part on the number of new credit card accounts that were opened and used by consumers (*see* Consent Order ¶ 25). Lower-level execs put tremendous pressure on sales personnel to sell the credit cards, and that "[w]orkers who failed to meet what they viewed as unrealistic sales goals were often disciplined or denied promotions."[3] One branch manager said that "he was sold on the job largely on the prospect of substantial bonuses that were tied to meeting sales numbers."[4] Finally, a BoA "regional executive whose territory covered Oregon and much of Washington state" was tasked with boosting the low ranking of that region in an internal BoA scorecard, where an "improved ranking would have resulted in higher pay for Disanto [that executive] and other executives in the region . . . The internal scorecard was based partly on customer service and compliance, but sales performance was weighted most heavily."[5]

86. A 2016 report published by the National Employment Law Project, an advocacy group for low-wage workers, detailed how the aggressive sales metrics at BoA and other banks created an environment where workers were encouraged to open new accounts regardless of what the customer wanted. One BoA employee worker recalled, "Managers really pushed me to ignore it when consumers say no."[6] Another Florida BoA employee described the pressure of not making a sale: "I had days that even though I tried really hard, I couldn't sell, and that's very scary. It's not a financial service position, it's a sales position. And that means it's not about the customer."[7] Further, employees described how sales metrics are tied to employee scheduling, "in which the

---

[3] Kevin Wack, *Ex-Bank of America employees allege 'extreme pressure' to sell credit cards*, AMERICAN BANKER (Aug. 27, 2020), https://www.americanbanker.com/news/ex-bank-of-america-employees-allege-extreme-pressure-to-sell-credit-cards.
[4] *Id.*
[5] *Id.*
[6] Anastasia Christman, *Banking on the Hard Sell: Low Wages and Aggressive Sales Metrics Put Bank Workers and Customers at Risk*, NATIONAL EMPLOYMENT LAW PROJECT (June 2016), https://www.nelp.org/app/uploads/2016/06/NELP-Report-Banking-on-the-Hard-Sell.pdf.
[7] *Id.*

most convenient or desirable work shifts were allocated after workers submit 'bids' based on their quota incentive points."[8]

87.     Other former BoA employees have described an environment where workers who failed to meet sales goals were "disciplined or denied promotions."[9] One former Oregon-based branch manager of BoA stated that "meeting sales numbers was literally all that mattered in his experience with Bank of America."[10] He further stated that when he joined BoA in 2019, substantial bonuses were tied to meeting sales numbers. He stated that he was instructed to "take disciplinary action" against employees not meeting their sales goals. Regarding the sales pressure from BoA, the former BoA branch manager stated: "They ride their good people hard and abuse their poor performers. . . . They want you to push credit cards to everyone."[11] According to a 2019 document reviewed by American Banker, for example, BoA's customer forms "lack[] an option for customers who simply do not want a [credit] card."[12]

88.     Under pressure to meet the quotas, BoA employees were driven to submit applications and open bank accounts without Plaintiffs' and Class Members' authorization or consent. Despite BoA's knowledge of the unlawful practices by its employees, it did little, if anything, to terminate the practices, nor to reform the sales incentive program.

89.     In July 2023, the CFPB and the Office of the Comptroller of the Currency ("OCC") levied fines and penalties against BoA. The CFPB ordered BoA to pay over $30 million in civil penalties relating to its practice of opening unauthorized accounts and pay redress to consumers.[13] The CFPB's Consent Order sets forth that BoA opened accounts without authorization "in response to sales pressure to obtain incentive rewards" (*see* Consent Order ¶ 26). Further, the Consent Order described harm to consumers from opening unauthorized accounts, including that

---

[8] *Id.*
[9] Wack, *supra* note 3.
[10] *Id.*
[11] *Id.*
[12] *Id.*
[13] *See* Consent Order ¶ 59.

such accounts "may have negatively impacted consumers including through fees charged; impacts to consumer credit profiles; the loss of control over personal identifying information; the expenditure of consumer time and effort investigating the facts and seeking closure of unwanted accounts; and the need to monitor and mitigate harm going forward." (*See* Consent Order ¶ 30.)

**B.     BoA's Faulty Account Opening Practices**

90.     Although BoA devised a lucrative sales incentive program to encourage its employees to open numerous accounts per customer, it failed to maintain sufficient controls and safeguards related to account openings to ensure that only accounts which were actually authorized by its customers were opened.

**a.     Failure to Adequately Verify Customer Identities Before Opening Accounts**

91.     In the normal course, a consumer opening a credit, debit, or savings account would submit an application, providing personally identifiable information. For a credit account, a consumer must also agree that the lender run a credit report. And a myriad of regulations intended to safeguard consumers, and deter bad actors, from opening fake accounts establish procedures for how this is to be accomplished. Remarkably, BoA wholly failed to comply with these processes, which provide consumers with fair notice about financial commitments, rates, fees, all of which are intended to protect consumers. To be clear, this complaint does not seek to enforce those regulations; that is the domain of regulators. Rather, this action seeks to redress consumers for the harm that opening these accounts caused.

92.     BoA's customers reasonably expected BoA to maintain controls and procedures for opening banking accounts, including verifying the identity of an account opener and sending notices to customers prior to, if not also immediately after, opening an account. The reason for this is plain: customers need to consent to the financial obligations opening an account imposes.

93.     But BoA failed to adequately verify a potential customer's identity before opening an account. Further, BoA's procedures allowed its employees to access Plaintiffs' and Class Members' personal information to open accounts without their consent and without providing

adequate notice. BoA should have closely monitored and limited employee-access to Plaintiffs'
and Class Members' personal information, such that unauthorized accounts would have been
flagged. BoA has acknowledged to the CFPB, for example, that before March 2017, it did not
require customers who opened accounts in its branches to provide signatures that could have
served as clear evidence of the customers' intent.[14] If BoA had implemented proper controls over
Plaintiffs' and Class Members' personal information, its employees would not have been able to
continue creating accounts except where customers had provided express authorization.

94.     Further, it was reasonable for customers to expect that BoA had procedures in place
for verifying the identity of the customer within a reasonable time after an account was opened,
such as by contacting the customer or obtaining verifying documents. The reason for this is also
plain: customers need to understand the purpose and necessity of the identity verification process.

95.     BoA similarly avoided or failed to monitor and enforce procedures for verifying
customers' identities and providing adequate notice after unauthorized accounts were opened
because doing so would have alerted customers of the unauthorized accounts.

### C.     Failure to Obtain Consent to Run a Credit Report or to Open a Credit Card Account

96.     As part of this unlawful practice, BoA employees improperly obtained "consumer
credit reports," as that term is defined in 15 U.S.C. § 1681a(d)(1), to open credit card accounts,
even when the customer had not applied for or did not want one. Upon information and belief,
BoA obtains consumer reports via a consumer reporting agency governed by the federal Fair Credit
Reporting Act ("FCRA"). BoA did not have Plaintiffs' and Credit Card Class Members'
permission to access their personal information, nor did it have a permissible purpose for obtaining
their consumer credit reports.

---

[14] Wack, *supra* note 3.

### a. Failure to Perform Reasonable Diligence to Detect Unauthorized Accounts

97. BoA customers reasonably expected the Bank to exercise due and reasonable diligence in regard to the opening and maintenance of every account, knowing and retaining the essential facts concerning every customer and concerning the authority of each person acting on behalf of such customer, and establishing and maintaining written policies and procedures that are reasonably designed to identify and verify the identity of customers.

98. BoA failed to exercise adequate diligence. If the Bank had, it would have been alerted to the unusual activities such as numerous unfunded accounts, frequent reopening of closed accounts, and/or consumer accounts in which the only activities were fees charged by BoA.

99. BoA's failure to monitor and prevent such conduct, including its reliance on its high-pressure incentive programs that led to unauthorized account opening, is particularly egregious considering that another prominent bank, Wells Fargo, faced stiff penalties for similar practices. There, Wells Fargo entered into a series of settlements with the regulators and consumers totaling $3.7 billion related to its conduct of opening unauthorized accounts.[15]

100. Moreover, BoA knew or should have known of the issue of unauthorized accounts being opened without consumers' knowledge and consent given the numerous consumer reports filed by consumers with the CFPB. According to the CFPB's complaint database, over 70,000 consumer complaints have been filed against Bank of America for issues pertaining to banking products and credit reports from January 1, 2012 through December 31, 2022.[16]

101. Yet, rather than investigate this issue and put in place adequate controls following this news, BoA ignored the issue and insisted that it did not have any "systemic sales misconduct" issues.[17]

---

[15] Francie Swidler, *You May Be Eligible For a Payout After $3.7B Wells Fargo Settlement Alleges 'Illegal' Practices*, NBC CHICAGO (Jan. 20, 2023), https://www.nbcchicago.com/news/local/you-may-be-eligible-for-a-payout-after-3-7b-wells-fargo-settlement-alleges-illegal-practices/3050504

[16] *See supra* § IV.E (listing a few of these complaints).

[17] *In the Matter of Bank of America Corp.*, No. 2019-MISC-Bank of America Corp.-0001, BoA Petition to Set Aside or, In the Alternative, Modify the Civil Investigative Demand, at 1 (Mar. 28,

**D. BoA Concealed Its Unlawful Practices**

102.    BoA actively concealed its practice of opening unauthorized accounts on behalf of Plaintiffs and Class Members. BoA concealed its fraud by withholding information regarding the source of the fraudulent accounts. Plaintiffs and Class Members who had accounts opened under their names at BoA often only learned of the accounts when they checked their credit reports or tried to open an account at another institution.

103.    When Plaintiffs and Class Members inquired with BoA about the existence of these accounts, BoA did not tell them it was the Bank itself that opened accounts without their permission, not third parties.

104.    BoA misled investigators and the public by making false and misleading statements. For example, following the investigation of Wells Fargo, the CFPB investigated BoA over opening credit card accounts without authorization in 2019. In one of the documents provided to the CFPB pursuant to its investigation, a lawyer for BoA acknowledged that the Bank found specific instances of what he called "*potentially unauthorized credit card accounts*," though he claimed the number of such accounts was "vanishingly small,"[18] and that BoA did not have "systemic sales misconduct" issues.[19] BoA further assured the public that it had thoroughly investigated its sales practices, and that "following industry attention to these issues years ago, [BoA] implemented additional controls and avenues for employees to express concerns through multiple channels as well as our Employee Relations group."[20] Plaintiffs and Class Members had no reason to know these representations were false and misleading.

105.    Nor could Plaintiffs and Class Members learn of BoA's unlawful conduct through other means. BoA "does not publicly disseminate": (1) information about its internal controls

---

2019), https://files.consumerfinance.gov/f/documents/201909_cfpb_bank-of-america_ petition.pdf.
[18] Kevin Wack, *CFPB investigating Bank of America over phony accounts*, AMERICAN BANKER (Sept. 17, 2019), https://www.americanbanker.com/news/cfpb-investigating-bank-of-america-over-phony-accounts.
[19] *See supra* note 20.
[20] Wack, *supra* note 3.

relating to its investigation of wrongdoing; and (2) "the details of its incentive compensation plans," which would include information about BoA's sales incentive program for opening unauthorized banking products.[21]

106.    By assuring the public and the CFPB that it did not have any issues of sales misconduct and keeping details of its internal controls and sales incentive program confidential, BoA concealed its practice of opening unauthorized accounts.

### E.    BoA's Practices Caused Serious Harm to Plaintiffs and the Classes

107.    BoA's actions allowed these sales practices to flourish and harm Class Members in ways they often did not discover until damage had already been done to their bank accounts and credit reports. As these fraudulent accounts were created without Plaintiffs' and Class Members' knowledge or consent, discovery of the existence of these accounts often came about inadvertently. Some Plaintiffs and Class Members learned of the fraudulent accounts when they attempted to open an account at another bank and were informed of the existence of a fraud investigation on their credit report; because of this fraud investigation, the affected Plaintiffs and Class Members were prevented from opening accounts at other financial institutions.

108.    Plaintiffs and Class Members were placed in an impossible position when they inquired about the existence of these fraudulent accounts, as BoA often refused to provide information about the accounts since the BoA customers did not possess the necessary confirming information, such as the phone number or email that had been used when the fraudulent account was opened in their name. BoA also refused to inform Plaintiffs and Class Members who had created these fraudulent accounts, leaving them uncertain if they had been a victim of identity theft or of BoA's own aggressive sales practices and unreasonable sales quotas. Some Plaintiffs and Class Members, worried about the possibility of continued identity theft, purchased additional

---

[21] *In the Matter of Bank of America Corp.*, No. 2019-MISC-Bank of America Corp.-0001, BoA Suppl. Submission in Support of Its Request for Confidential Treatment, at 4 (Aug. 2, 2019), https://files.consumerfinance.gov/f/documents/201909_cfpb_bank-of-america_supplemental-submission-confidential-treatment.pdf.

fraud protection through credit bureaus, leading to additional expense that they would otherwise not have incurred without BoA's fraudulent acts.

109. Online, several Class Members have shared their common experience of dealing with Bank of America's unauthorized opening of accounts—which include by way of representative example:

    a.    Receiving multiple emails from Bank of America regarding a credit card application that the Class Member never made.[22]

    b.    Spending hours on the phone with Bank of America trying to shut down checking accounts that were opened without the Class Member's consent.[23]

    c.    Discovering that Bank of America had opened an account using the Class Member's old email address.[24]

    d.    Expending significant time and energy to no avail trying to get any information from Bank of America after it opened an account in the Class Member's name without their consent.[25]

110. Below are representative examples of consumers' complaints filed with the CFPB relating specifically to unauthorized accounts being opened without their knowledge or authorization:

    a.    I have contacted Bank of America regarding fraudulent accounts opened in my name. I have never opened a credit card with them. XXXX was able to remove one of the credit cards from Bank of America from my credit report.[26]

---

[22] https://www.reddit.com/r/personalfinance/comments/xvnepc/what_do_i_do_about_continuing_credit_card/.

[23] https://www.reddit.com/r/Scams/comments/12hk7yk/i_know_its_a_scam_but_im_not_sure_how_exactly_it/.

[24] https://www.reddit.com/r/Superstonk/comments/14wtd8x/comment/jroljz3/.

[25] https://www.reddit.com/r/Banking/comments/wdjxa0/woke_up_to_a_new_bank_of_america_checking_account/.

[26] Consumer Complaint No. 3400033, CFPB (reported Oct. 9, 2019), https://www.consumerfinance.gov/data-research/consumer-complaints/search/detail/3400033.

b. Customers like myself had credit cards opened in their names without their knowledge. Bonuses was given to the bank representative that fraudulently applied for the credit card. . . . The bank manager XXXX XXXX, did not file a complaint in XX/XX/XXXX. She acknowledged that XXXX had committed credit card fraud and I had not received a disclosure.[27]

c. I received a letter from Bank of America saying that they received a credit card request that I had not filed.

d. I was notified by email from XXXX that someone opened a credit card with my social security number with Bank of America.[28]

e. I received notices from Bank of America that I opened a checking and savings account at the Bank. The following day, I received mail that the Bank closed the newly opened accounts immediately. I never applied to open these accounts at Bank of America.[29]

111. Further, since the announcement of the Consent Order, over 206 complaints have been filed on the CFPB's website concerning unauthorized accounts being opened without consumers' knowledge or authorization.[30] Below are some representative examples:

---

[27] Consumer Complaint No. 2104060, CFPB (reported Sept. 9, 2016), https://www.consumerfinance.gov/data-research/consumer-complaints/search/detail/2104060.

[28] Consumer Complaint No. 5758954, CFPB (reported July 11, 2022), https://www.consumerfinance.gov/data-research/consumer-complaints/search/detail/5758954.

[29] Consumer Complaint No. 1781414, CFPB (reported Feb. 10, 2016), https://www.consumerfinance.gov/data-research/consumer-complaints/search/detail/1781414.

[30] Consumer Complaint Database, CFPB https://www.consumerfinance.gov/data-research/consumer-complaints/search/?chartType=line&dateInterval=Month&date_received_max=2024-09-22&date_received_min=2023-07-01&issue=Opening%20an%20account%E2%80%A2Account%20opened%20without%20my%20consent%20or%20knowledge&lens=Product&searchField=all&searchText=bank%20of%20america&subLens=sub_product&tab=Trends.

112.　02/05/2024: "We received a letter from Bank of America dated XX/XX/2024 welcoming my business LLC to Business Advantage Fundamentals Banking Account. We did not request to open an account."[31]

113.　03/04/2024: "I received an email a few months ago that stated the account could not be open without further identification process from Bank of America. Upon calling them I learned that there was two checking accounts opened in my name with my Social Security that I was not aware about. I asked for documentation proving how this was opened in my name with my social, and what ID was used to use this. They could not provide any information besides telling me that the account would be closed due to identity fraud."[32]

114.　04/10/2024: "Received a latter [sic] in the mail stating a business checking account was opened in my name XX/XX/2024. Called the bank informed them this was not an account I opened. and the bank assured me the account was flagged and closed. I never received paperwork stating it was closed and why it was opened without the proper documentation to identify me in the first place."[33]

115.　04/13/2024: "A fraudulent Bank Account was opened in my name on XX/XX/2023. I have contacted Bank of America several times and to date I have not received a letter stating the account was not mines with the correct name it was opened with."[34]

---

[31]　Consumer Complaint No. 8287278, CFPB (reported Feb. 5, 2024), https://www.consumerfinance.gov/data-research/consumer-complaints/search/detail/8287278.
[32]　Consumer Complaint No. 8477217, CFPB (reported Mar. 4, 2024), https://www.consumerfinance.gov/data-research/consumer-complaints/search/detail/8477217.
[33]　Consumer Complaint No. 8740199, CFPB (reported Apr. 10, 2024), https://www.consumerfinance.gov/data-research/consumer-complaints/search/detail/8740199.
[34]　Consumer Complaint No. 8758547, CFPB (reported Apr. 13, 2024), https://www.consumerfinance.gov/data-research/consumer-complaints/search/detail/8758547.

116. BoA's unlawful practices negatively impacted Plaintiffs and Class Members and caused them numerous harms, including, but not limited to:

      a.    Economic harm for fees charged for unauthorized accounts;

      b.    Negative impact to their credit as a result of a credit report being run without their authorization or consent and/or as a result of the unauthorized banking account appearing on their credit report, and applications for consumer banking accounts with other banks;

      c.    Loss of control over their personal information;

      d.    Out of pocket costs associated with purchasing of costly identity theft protection services to ensure against further fraudulent activity;

      e.    Spending time and effort to investigate the facts, to dispute charges, to seek closure of unauthorized accounts; and

      f.    Needing to mitigate harm going forward.

117. Moreover, even if consumers reported the issue to BoA, there was no guarantee that the unauthorized accounts would be closed with all improper fees, charges, and/or negative credit impacts remedied, reversed, and/or refunded.

## V.      TOLLING OF THE STATUTE OF LIMITATIONS

118. All applicable statutes of limitation have been tolled by BoA's knowing and active fraudulent concealment and denial of the facts alleged herein through the time period relevant to this action.

119. The full extent of BoA's omissions and misrepresentations is still not known. BoA has never made public the details of its systemic opening of unauthorized accounts and charging associated fees. BoA knew its employees opened fraudulent, unauthorized accounts, but nevertheless charged customers fees associated with those unauthorized accounts and concealed the fraud to protect their reputation and financial interests. Indeed, the fact that BoA's deception was only publicly revealed in July 2023 when the CFPB made public its enforcement action against

the Bank indicates that BoA always intended to withhold this information from its customers and the public.

120.    Plaintiffs and Class Members did not know about BoA's and its employees' actions to open unauthorized accounts. When individual Plaintiffs and Class Members did learn about this unauthorized activity and sought answers from BoA, BoA withheld information from them, thereby preventing them from learning about the factual bases for these claims for relief. Class Members who were fraudulently assigned unauthorized accounts and charged improper fees associated with those unauthorized accounts outside of the applicable statute of limitations could not have discovered through the exercise of reasonable diligence that BoA's purpose in obtaining and using Class Members' consumer credit reports was to open unauthorized accounts ostensibly on behalf of Class Members and was concealing the conduct complained of herein. Despite reasonable diligence on their part, Plaintiffs and Class Members remained ignorant of the factual bases for their claims for relief.

121.    For these reasons, all applicable statutes of limitations have been tolled by operation of the discovery rule with respect to all claims set forth below. And all applicable statutes of limitation have also been tolled by BoA's knowing and active fraudulent concealment of the facts alleged herein throughout the time period relevant to this action.

## VI.    CLASS ACTION ALLEGATIONS

122.    Plaintiffs bring this action on behalf of themselves and all others similarly situated pursuant to Rule 23(b)(2) and 23(b)(3) of the Federal Rules of Civil Procedure.

123.    The Credit Card Class Plaintiffs seek to represent the following Class:

   i.    **Credit Card Class:** All persons in the United States whose credit reports or other sensitive consumer information were obtained and/or used by Bank of America or its agents without a permissible purpose and without the person's prior knowledge or consent, and all persons in the United States who Bank of

America or its agents opened a credit card product in their name without their prior knowledge or authorization during the Class Period.

124. The Accounts Class Plaintiffs seek to represent the following Class:

     i.    **Accounts Class**: All persons in the United States who had one or more unauthorized or unwanted account(s) opened by Bank of America or its agents during the Class Period.

125. Further, the Accounts Class Plaintiffs propose the following State Accounts Subclass definitions, subject to amendment as appropriate:

     i.    **California Accounts Subclass:** All persons in California who had one or more unauthorized or unwanted account(s) opened by BoA its agents during the Class Period.

     ii.    **Florida Accounts Subclass:** All persons in Florida who had one or more unauthorized or unwanted account(s) opened by BoA or its agents during the Class Period.

     iii.    **Georgia Accounts Subclass:** All persons in Georgia who had one or more unauthorized or unwanted account(s) opened by BoA or its agents during the Class Period.

     iv.    **Illinois Accounts Subclass:** All persons in Illinois who had one or more unauthorized or unwanted account(s) opened by BoA or its agents during the Class Period.

     v.    **Minnesota Accounts Subclass:** All persons in Minnesota who had one or more unauthorized or unwanted account(s) opened by BoA or its agents during the Class Period.

     vi.    **New Jersey Accounts Subclass:** All persons in New Jersey who had one or more unauthorized or unwanted account(s) opened by BoA or its agents during the Class Period.

vii. **Nevada Accounts Subclass:** All persons in Nevada who had one or more unauthorized or unwanted account(s) opened by BoA or its agents during the Class Period.

viii. **North Carolina Accounts Subclass:** All persons in North Carolina who had one or more unauthorized or unwanted account(s) opened by BoA or its agents during the Class Period.

ix. **Virginia Accounts Subclass:** All persons in Virginia who had one or more unauthorized or unwanted account(s) opened by BoA or its agents during the Class Period.

126. Excluded from the Classes are the Court, and BoA and its officers, directors, employees, affiliates, legal representatives, predecessors, successors and assigns, and any entity in which any of them have a controlling interest.

127. **Numerosity and Ascertainability:** The members of the Credit Card Class are so numerous that joinder of all members is impractical. The members of the Accounts Class and the related Accounts Subclasses are also so numerous that joinder of all members is impractical. BoA operates more than 3,900 full-service bank branches nationwide, through which it offers deposit and credit products. The proposed Classes contain many thousands of members. The precise number of members can be ascertained through discovery, which will include Defendant's records.

128. **Commonality and Predominance:** The action involves common questions of law and fact, which predominate over any question solely affecting individual Credit Card Class Members or Accounts Class Members and any related Accounts Subclasses. These common questions for Credit Card Class Members' and Accounts Class Members' priority claims include:

a. Whether and how BoA and its employees engaged in unlawful practices by applying for and obtaining consumer credit reports to open accounts without Class Members' knowledge or authorization;

b. Whether BoA failed to properly notify Class Members and otherwise concealed the opening of the unauthorized accounts;

c. Whether BoA charged fees and other fines to Class Members relating to unauthorized accounts;

d. Whether BoA and its employees accessed Class Members' credit reports during the process of opening accounts without Class Members' knowledge or authorization;

e. Whether BoA acted willfully or knowingly when opening credit cards and other Banking Products without Credit Card Class Members' knowledge or authorization;

f. Whether BoA acted negligently in failing to implement proper controls and procedures for preventing the opening of unauthorized accounts;

g. Whether BoA knew or should have known of its employees' deceptive, unlawful practices;

h. Whether BoA breached a duty to Class Members by failing to adequately monitor and control access to Class Members' personal information and to ensure that its employees did not apply for and/or open accounts without the knowledge or authorization of the Plaintiffs and Class Members;

i. Whether BoA has engaged in unfair methods of competition, unconscionable acts or practices, and unfair fair or deceptive acts or practices with the unauthorized opening of accounts;

j. Whether BoA violated North Carolina and/or other states' consumer protection statutes;

k. Whether BoA has been unjustly enriched;

l. Whether, because of BoA's conduct, Plaintiffs and the Class have suffered damages (and, if so, the appropriate amount thereof); and

> m.    Whether because of BoA's misconduct, Plaintiffs and the Class are entitled to damages.

129.    **Typicality:** Credit Card Plaintiffs' claims are typical of the Credit Card Class Members' claims because all Class Members were comparably injured through Defendant's substantially uniform misconduct as described above. Further, Accounts Plaintiffs' claims are typical of the Accounts Class Members' claim because all Class Members were comparably injured through Defendant's substantially uniform misconduct as described above. The claims of the Plaintiffs and each of the two subclasses arise from the same operative facts and are based on the same legal theories.

130.    **Adequacy:** The Credit Card Plaintiffs are adequate Class Representatives of the Credit Card Class because their interests do not conflict with the interests of the other members of the Class they seek to represent. Further, the Accounts Plaintiffs are adequate Class Representatives of the Accounts Class because their interests do not conflict with the interests of the other members of the Class they seek to represent. Plaintiffs have retained counsel competent and experienced in complex class action litigation, and Plaintiffs intend to prosecute this action vigorously. The interests of the two Classes will be fairly and adequately protected by the Plaintiffs and their counsel.

131.    **Superiority:** A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The damages and other detriment suffered by Plaintiffs and the Members of the two Classes are relatively small compared to the burden and expense that would be required to individually litigate their claims against Defendant, so it would be virtually impossible for the Members of the two Classes to individually seek redress for Defendant's wrongful conduct. Even if Members of the two Classes could afford individual litigation, the court system could not. Individualized litigation creates a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system. By contrast, the

class action device presents far fewer management difficulties, and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

132. Class certification under Rule 23(b)(2) is also warranted for purposes of injunctive and declaratory relief because Defendant has acted or refused to act on grounds generally applicable to the Classes, so that final injunctive and declaratory relief are appropriate with respect to each Class as a whole.

## VII.  CHOICE OF LAW FOR NATIONWIDE CLAIMS

133. The state laws of one state will likely govern Plaintiffs' claims.

134. First, the principal place of business of BoA, located in Charlotte, North Carolina, is the "nerve center" of its business activities—the place where its high-level officers direct, control, and coordinate the corporation's activities, including its data security functions and major policy, financial, and legal decisions.

135. North Carolina has a significant interest in regulating the conduct of businesses operating within their border. North Carolina, which seeks to protect the rights and interests of residents and citizens of the United States against a company headquartered and doing business in its state, has a greater interest in the nationwide claims of Plaintiffs and Class Members than any other state and are most intimately concerned with the claims and outcome of this litigation.

136. Upon information and belief, BoA's incentive sales program, and corporate decisions surrounding the opening of accounts, were made from and in North Carolina.

137. BoA's breaches of duty to Plaintiffs and Accounts Class Members emanated from North Carolina.

138. Additional factual analysis is necessary in order to determine which state's law should apply to the claims of the Class Members. Accordingly, it would be inappropriate to determine choice of law at the pleadings stage of this case. Plaintiffs are therefore pleading nationwide claims based upon North Carolina law in the alternative (or under the law of the states of each Plaintiff).

139.     Application of North Carolina law with respect to Plaintiffs' and Class Members' claims after the completion of a factual inquiry would be neither arbitrary nor fundamentally unfair because the state has significant contacts and a significant aggregation of contacts that create a state interest in the claims of Plaintiffs and Class Members.

140.     Under choice of law principles applicable to this action, the common law of North Carolina would apply to the nationwide common law claims of all class members given North Carolina's significant interest in regulating the conduct of businesses operating within their borders. Consumer protection laws may be applied to non-resident consumer plaintiffs upon completion of the factual analysis required for the choice of law determination.

## VIII.     CAUSES OF ACTION

### COUNT I
### Violations of the Fair Credit Reporting Act ("FCRA")
### On Behalf of the Credit Card Class

141.     The Credit Card Class Plaintiffs incorporate by reference all allegations of this complaint as though fully set forth herein.

142.     As individuals, the Credit Card Class Plaintiffs and Credit Card Class Members are consumers entitled to the protections of the FCRA. 15 U.S.C. § 1681a(c).

143.     As defined in 15 U.S.C. § 1681a(d), a consumer report is: any "written, oral, or other communication of any information by a consumer reporting agency bearing on a consumer's credit worthiness, credit standing, credit capacity, character, general reputation, personal characteristics, or mode of living which is used or expected to be used or collected in whole or in part for the purpose of serving as a factor in establishing the consumer's eligibility for—(A) credit or insurance to be used primarily for personal, family, or household purposes; (B) employment purposes; or (C) any other purpose authorized under section 1681b of this title."

144.     When BoA opens a new credit card account, it obtains a consumer report, as that term is defined in 15 U.S.C. § 1681a(d), to review and assess the consumer's creditworthiness for the new product for whom the account is opened.

145. BoA agreed and represented in its agreements with the national consumer reporting agencies ("CRAs") from which it obtains consumer reports that BoA would use consumer reports only for lawful purposes under the FCRA as defined 15 U.S.C. § 1681b(f).[35]

146. The authorized purposes specified in FCRA include consumer reports furnished "in connection with a credit transaction involving the consumer on whom the information is to be furnished and involving the extension of credit to, or review or collection of an account of, the consumer." 15 U.S.C. § 1681b(a)(3)(A).

147. 15 U.S.C. §§ 1681b, 1681n, and 1681q give BoA statutory requirements to refrain from obtaining or using consumer reports from CRAs under false pretenses, and without proper authorization from the consumer who is the subject of the report.

148. BoA has obligations to follow reasonable procedures, including those that would prevent the impermissible accessing of consumer reports. 15 U.S.C. § 1681b(f).

149. However, BoA regularly pulled consumer reports regarding consumers without their knowledge or consent to open unauthorized accounts and services as part of its scheme, in violation of the FCRA.

150. By using or obtaining consumer reports without a permissible purpose, BoA violated Section 604(f) of the FCRA, 15 U.S.C. § 1681b(f).

151. Pursuant to 15 U.S.C. §§ 1681n and 1681o, BoA is liable for negligently and/or willfully violating the FCRA by accessing the consumer reports without a permissible purpose or authorization under the FCRA.

152. Credit Card Class Plaintiffs and the Credit Card Class seek all available damages and relief under the FCRA.

---

[35] A "person shall not use or obtain a consumer report for any purpose unless – (1) the consumer report is obtained for a purpose for which the consumer is authorized to be furnished" and one other condition is met. 15 U.S.C. § 1681b(f).

## COUNT II
### Negligence
### On Behalf of the Accounts Class and the State Accounts Subclasses

153.   The Accounts Class Plaintiffs incorporate by reference all allegations of this complaint as though fully set forth herein.

154.   The Accounts Class Plaintiffs and Accounts Class Members entrusted their personal information to Defendant on the premise and with the understanding that they would safeguard their personal information, use the information for business purposes only, and/or not disclose their personal information to unauthorized third parties.

155.   BoA owed a duty of care to the Accounts Class Plaintiffs and Accounts Class Members to adequately control access to the Accounts Class Plaintiffs' and Accounts Class Members' personal information and to ensure its employees did not apply for and/or authorize new accounts without customers' knowledge or consent. The existence of this duty is confirmed by the statutes outlined above, including the Bank Security Act (31 U.S.C. § 5311, *et seq.*), the Fair Credit Reporting Act (15 U.S.C. § 1681, *et seq.*) and the Truth in Lending Act (15 U.S.C. § 1642, *et seq.*).

156.   Defendant breached its duty to by implementing an incentive program whereby it rewarded its employees for opening new accounts, creating a high-pressure environment that encouraged its employees to open unauthorized accounts. Defendant also failed to implement adequate safeguards and controls to ensure unauthorized accounts were not opened by its employees, such as requiring consumer's identities be verified prior to and shortly after the opening of an account, sending notice prior to the opening of an account, and obtaining consent from customers prior to running their credit reports. It also failed to exercise reasonable care in monitoring the opening of new accounts, to confirm that the accounts had not been open without authorization.

157.   BoA further breached its duties by failing to exercise reasonable care in supervising its agents, contractors, vendors, and suppliers, and in handling and securing the personal information of the Accounts Class Plaintiffs and Accounts Class Members which actually and

proximately caused the unauthorized accounts to be opened and which resulted in the Accounts Class Plaintiffs' and Accounts Class Members' injury.

158.    BoA further breached its duties by failing to notify the Accounts Class Plaintiffs and Accounts Class Members of the opening of the unauthorized accounts, which actually and proximately caused and exacerbated the harm of the opening of the unauthorized accounts.

159.    Defendant acted with wanton and reckless disregard for the security and confidentiality of Plaintiffs and Class Members.

160.    As a direct and traceable result of BoA's negligence and/or negligent supervision, the Accounts Class Plaintiffs and Accounts Class Members have suffered or will suffer damages, including monetary damages, increased risk of future harm, embarrassment, humiliation, frustration, and emotional distress.

161.    BoA's breach of its common-law duties to exercise reasonable care and its failures and negligence actually and proximately caused the Accounts Class Plaintiffs and Accounts Class Members actual, tangible, injury-in-fact and damages, including, without limitation, harm to their credit score from a credit report being run and/or from an unauthorized account appearing on their credit report, damages from fees associated with the unauthorized accounts, the loss of control over their personal information, lost value of their personal information, and lost time and money incurred to mitigate and remediate the effects of the BoA's negligence, which injury-in-fact and damages are ongoing, imminent, immediate, and which they continue to face.

## COUNT III
## Unjust Enrichment
## On Behalf of All Plaintiffs, All Classes, and All Subclasses

162.    Plaintiffs incorporate by reference all allegations of this complaint as though fully set forth herein.

163.    As a result of BoA's unlawful and deceptive actions described herein, BoA was enriched at the expense of Plaintiffs and the Class through the payment of fees, penalties, and other charges resulting from unlawfully opened accounts, products, and services. BoA was further

enriched by publicly reporting higher account numbers in its annual and quarterly reports as a result of this unlawful practice.

164.    BoA's unjust enrichment is traceable to, and resulted directly and proximately from, the conduct alleged herein. Had BoA enacted adequate standards and controls to prevent employees from opening accounts on their own initiative—such as by restricting employees' access to customers' personal information, requiring express consent from consumers, and conducting due diligence regarding the opening of accounts—Plaintiffs and Class Members would not have been harmed by the opening of unauthorized accounts. BoA has been unjustly enriched at the expense of, and to the detriment of, Plaintiffs and Class Members.

165.    Under the common law doctrine of unjust enrichment, it is inequitable to permit BoA to retain the ill-gotten benefits that it received from Plaintiffs and the Classes, because BoA used illegal, deceptive, and/or unfair practices to open accounts for Plaintiffs and Class Members without their knowledge or authorization. Thus, it would be unjust and inequitable for BoA to retain those benefits without restitution to Plaintiffs and the Classes for the monies paid to BoA because of the unfair, deceptive, and/or illegal practices.

166.    As a result of this conduct, Plaintiffs and the Classes seek disgorgement of all ill-gotten profits as a result of the scheme.

## COUNT IV
### Declaratory Relief
### On Behalf of All Plaintiffs, All Classes, and All Subclasses

167.    Plaintiffs incorporate by reference all allegations of this complaint as though fully set forth herein.

168.    The Declaratory Judgment Act, 28 U.S.C. § 2201(a), provides that in "a case of actual controversy within its jurisdiction . . . any court of the United States . . . may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a). Furthermore, the Court has broad

authority to restrain acts, such as here, that are tortious and violate the terms of the federal and state statutes described in this Complaint.

169.    An actual controversy has arisen regarding BoA's present and prospective common law and other duties to reasonably protect Plaintiffs and the Class from unauthorized accounts.

170.    As described above, this Court has jurisdiction over this matter, and therefore may declare the rights of Plaintiffs and the Classes.

171.    Plaintiffs and the Classes therefore seek an order declaring BoA's practice of opening unauthorized accounts unlawful, and that BoA is liable to Plaintiffs and the Classes for damages caused by that practice. The Court also should issue corresponding prospective injunctive relief requiring BoA to employ adequate security protocols consistent with law and industry standards to prevent the opening of unauthorized accounts.

172.    If an injunction is not issued, Plaintiffs and Class Members will suffer irreparable injury, and lack an adequate legal remedy, in the event further unauthorized accounts are opened. The risk of BoA's continued illegal conduct is real, immediate, and substantial. If further BoA continues to open unauthorized accounts, Plaintiffs and Class Members will not have an adequate remedy at law because many of the resulting injuries are not readily quantified and they will be forced to bring multiple lawsuits to rectify the same conduct.

173.    The hardship to Plaintiffs and Class Members if an injunction does not issue exceeds the hardship to BoA if an injunction is issued. Among other things, in the event that BoA continues to open unauthorized accounts, Plaintiffs and Class Members will likely face additional fees, harm to their credit, and lost time mitigating the effects. On the other hand, the cost to BoA of complying with an injunction by employing reasonable measures to verify consent before opening a banking account is relatively minimal, and BoA has a pre-existing legal obligation to employ such measures.

174.    Issuance of the requested injunction will not disserve the public interest. To the contrary, such an injunction would benefit the public by preventing BoA from opening further

unauthorized accounts, thus eliminating the additional injuries that would result to Plaintiffs and Class Members.

**COUNT V**
**North Carolina Unfair and Deceptive Trade Practices Act ("UDTPA"), N.C. Gen. Stat. Ann. §§ 75-1, *et seq.***
**On Behalf of Plaintiffs and the Accounts Class, or Alternatively, on Behalf of Plaintiffs and the Statewide North Carolina Subclass**

175.     Plaintiffs incorporate by reference all allegations of this complaint as though fully set forth herein, except those applying solely to the Credit Card Class.

176.     The UDTPA protects both consumers and competitors by promoting fair competition in commercial markets for goods and services. The UDTPA "declares unlawful" all "unfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affective commerce." N.C. Gen. Stat. Ann. § 75-1.1(a).

177.     BoA affected commerce by engaging in trade directly or indirectly affecting the people of North Carolina, as defined by N.C. Gen. Stat. Ann. § 75-1.1(b), by advertising, offering, and selling banking products, including checking and savings accounts, and loans.

178.     In violation of the UDTPA, BoA engaged in unfair, unlawful and/or deceptive trade practices, including, but not limited to:

    a.    Defendant opened bank accounts without the authorization and consent of the Plaintiffs and Class Members;

    b.    Defendant failed to safeguard Plaintiffs' and Class Members' personal information and allowed employees to access such information to open unauthorized accounts;

    c.    Defendant failed to implement adequate controls and conduct reasonable diligence, such as by verifying customer's identification and monitoring the opening of accounts with no or little activity, to prevent Plaintiffs and Class Members from having unauthorized accounts opened on their behalf;

d.   Defendant obtained consumer reports and submitted applications for Plaintiffs and Class Members without their authorization or consent. This conduct, with little if any utility, is unfair when weighed against the harm to Plaintiffs and Class Members, including harms in the form of fees charged and impacts to their credit reports;

e.   Defendant's design and implementation of an employee incentive compensation program that set unrealistic quotas of new accounts for BoA employees to open, rewarded BoA employees for the sheer number of accounts it opened on behalf of Plaintiffs and Class Members, even if those accounts were opened without the authorization of Plaintiffs and Class Members, and punished BoA employees for failing to hit such quotas. Defendant's incentive program created a high-pressure environment where employees were pressured to open unauthorized accounts;

f.   Defendant failed to correct BoA employees who opened accounts without the authorization of Plaintiffs and Class Members, including through the deceptive, unfair conduct described above;

g.   Defendant failed to notify Plaintiffs and Class Members that it opened unauthorized accounts on their behalf but without their consent, including through the deceptive, unfair conduct described above;

h.   Defendant charged Plaintiffs and Class Members fees associated with the accounts that it opened without the authorization of Plaintiffs and Class Members;

i.   Defendant failed to notify Plaintiffs and Class Members that it charged them fees associated with the unauthorized accounts the Bank opened on their behalf but without their consent;

j.   Defendant was obligated to comply with federal law, including with the Fair Credit Reporting Act (15 U.S.C. § 1681) and Truth in Lending Act (15 U.S.C. § 1642; 12 C.F.R. § 1026.12(a)), as well as the Bank Secrecy Act and anti-money laundering regulations. Despite its obligations, BoA failed to comply with these laws and it omitted, suppressed, and concealed that fact from Plaintiffs and Class Members;

k.   Defendant's deceptive, unfair practices also led to substantial injuries, as described above, that are not outweighed by any countervailing benefits to consumers or competition. Moreover, because Plaintiffs and Class Members could not know of Defendant's deceptive scheme to open unauthorized accounts and charge customers associated fees, including by obtaining consumer reports and using such reports to submit credit applications without the authorization of Plaintiffs and Class Members, consumers could not have reasonably avoided the harms that Defendant caused;

l.   Defendant omitted, suppressed, and concealed the material facts described above to Plaintiffs and Class Members; and

m.   Other ways to be discovered and proved at trial.

179.   BoA engaged in the above conduct intentionally, recklessly, and/or negligently for the benefit of BoA and/or its employees, and to the detriment of Plaintiffs and Class Members.

180.   BoA's conduct was unfair and deceptive as it involved using Plaintiffs' and Class Members' personal information without their knowledge or consent. Such conduct offends public policy and is immoral, unethical, oppressive, unscrupulous, and substantially injurious to Plaintiffs and Class Members.

181.   BoA's conduct was an inequitable assertion and abuse of power and position since the Bank secretly used private and confidential information entrusted to it by its customers for the

Bank's benefit and at its customers' expense. Plaintiffs and Class Members never authorized the use of their personal information in this manner, nor were they informed that it would be so used.

182.     Moreover, Plaintiffs and Class Members were misled about how and why these accounts were opened by being told they were victims of identity theft or a data breach.

183.     Plaintiffs and Class Members were injured by the impact on their credit scores because of the credit checks performed to open these unauthorized account and/or the unauthorized accounts appearing on their credit reports; being charged fees for accounts and services for which they did not authorize; loss of control of their personal identifying information; spending time and effort investigating and closing these accounts; being given false or misleading information on how these accounts were opened; and the need and expense monitoring their credit reports, personal identifying information, and bank accounts going forward.

184.     As a direct and proximate result of these deceptive acts and practices, Plaintiffs and the Class suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages, including damage as a result of the unauthorized accounts appearing on their credit reports, damage to their credit score from a credit report being run to open the unauthorized credit card account, damages from fees associated with the unauthorized accounts, lost time and effort spent investigating the unauthorized account, reporting the issue to BoA, making sure it was corrected, and attempting to mitigate further harm, including harm to potential identity theft, the loss of control over personal identifying information, and payment for crediting monitoring and lock services.

185.     Plaintiffs and the Class seek all available damages and relief under the UDTPA, including but not limited to treble damages as well as reasonable costs and attorneys' fees.

## IX. CLAIMS ON BEHALF OF THE CALIFORNIA ACCOUNTS SUBCLASS

## COUNT VI
### California Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §§ 17200, *et seq.*
### On Behalf of the California Plaintiff and the California Accounts Subclass

186. Plaintiffs incorporate by reference all allegations of this complaint as though fully set forth herein, except those applying solely to the Credit Card Class.

187. Plaintiff Miedo Donque (the "California Plaintiff") brings this Claim on behalf of himself and members of the California Accounts Subclass.

188. Defendant violated the UCL by engaging in unlawful, unfair, and deceptive business acts and practices.

189. Defendant's unlawful, unfair acts and deceptive acts and practices include:

   a. Defendant opened bank accounts without the authorization and consent of California Plaintiff and the California Subclass Members;

   b. Defendant failed to safeguard California Plaintiff's and the California Subclass Members' personal information and allowed employees to access such information to open unauthorized accounts;

   c. Defendant failed to implement adequate controls and conduct reasonable diligence, such as by verifying customer's identification and monitoring the opening of accounts with no or little activity, to prevent California Plaintiff and the California Subclass Members from having unauthorized accounts opened on their behalf;

   d. Defendant obtained consumer reports and submitted applications for California Plaintiff and the California Subclass Members without their authorization or consent. This conduct, with little if any utility, is unfair when weighed against the harm to California Plaintiff and the California Subclass Members, including harms in the form of fees charged and impacts to their credit reports;

e.   Defendant's design and implementation of an employee incentive compensation program that set unrealistic quotas of new accounts for BoA employees to open, rewarded BoA employees for the sheer number of accounts it opened on behalf of California Plaintiff and the California Subclass Members, even if those accounts were opened without the authorization of California Plaintiff and the California Subclass Members, and punished BoA employees for failing to hit such quotas. Defendant's incentive program created a high-pressure environment where employees were pressured to open unauthorized accounts;

f.   Defendant failed to correct BoA employees who opened accounts without the authorization of California Plaintiff and the California Subclass, including through the deceptive, unfair conduct described above;

g.   Defendant failed to notify California Plaintiff and the California Subclass Members that it opened unauthorized accounts on their behalf but without their consent, including through the deceptive, unfair conduct described above;

h.   Defendant charged California Plaintiff and the California Subclass Members fees associated with the accounts that it opened without the authorization of Plaintiffs and the California Subclass Members;

i.   Defendant failed to notify California Plaintiff and the California Subclass Members that it charged them fees associated with the unauthorized accounts the Bank opened on their behalf but without their consent;

j.   Defendant misrepresented that BoA would comply with its obligations under federal law, including with the Fair Credit Reporting Act (15 U.S.C. § 1681) and Truth in Lending Act (15 U.S.C. § 1642; 12 C.F.R. § 1026.12(a)), as well as the Bank Secrecy Act and anti-money laundering regulations. Despite these

representations, BoA failed to comply with these laws and it omitted, suppressed, and concealed that fact from California Plaintiff and the California Subclass Members;

k. Defendant's deceptive, unfair practices also led to substantial injuries, as described above, that are not outweighed by any countervailing benefits to consumers or competition. Moreover, because California Plaintiff and the California Subclass Members could not know of Defendant's deceptive scheme to open unauthorized accounts and charge customers associated fees, including by obtaining consumer reports and using such reports to submit credit applications without the authorization of California Plaintiff and the California Subclass Members, consumers could not have reasonably avoided the harms that Defendant caused;

l. Defendant omitted, suppressed, and concealed the material facts described above to California Plaintiff and the California Subclass Members; and

m. Other ways to be discovered and proved at trial.

190. Defendant's representations and material omissions of fact, as alleged herein, to California Plaintiff and the California Subclass Members were material because they were likely to deceive reasonable consumers about the purpose for obtaining consumer reports, the submission of applications for unauthorized accounts without the consent of California Plaintiff and the California Subclass, the opening of unauthorized accounts without the consent of California Plaintiff and the California Subclass, and the charging of fees associated with unauthorized accounts opened without the consent of California Plaintiff and the California Subclass.

191. Defendant intended to mislead California Plaintiff and the California Subclass Members and induce them to rely on their misrepresentations and material omissions of fact as alleged herein.

192. Had Defendant disclosed to California Plaintiff and the California Subclass Members that BoA employees had opened unauthorized accounts with the consent of California Plaintiff and the California Subclass Members, Defendant would have been unable to continue incentivizing its employees to make new sales—which contribute significantly to the Bank's profits—and it would have been forced to close accounts, refund fees en masse, and comply with the law. Accordingly, California Plaintiff and the California Subclass Members acted reasonably in relying on Defendant's misrepresentations and material omissions of fact, the truth of which they could not have discovered.

193. Defendant acted intentionally, knowingly, and maliciously to violate California's Unfair Competition Law, and recklessly disregarded California Plaintiff's and the California Subclass Members' rights.

194. As a direct and proximate result of Defendant's unfair, unlawful, and fraudulent acts and practices, California Plaintiff and the California Subclass Members have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages as described herein and as will be proved at trial, including damage as a result of the unauthorized accounts appearing on their credit reports, damage to their credit score from a credit report being run to open the unauthorized credit card account, damages from fees associated with the unauthorized accounts, lost time and effort spent investigating the unauthorized account, reporting the issue to BoA, making sure it was corrected, and attempting to mitigate further harm, including harm to potential identity theft, the loss of control over personal identifying information, and payment for crediting monitoring and lock services.

195. California Plaintiff and the California Subclass Members seek all monetary and non-monetary relief allowed by law, including restitution of all profits stemming from Defendant's unfair, unlawful, and fraudulent business practices; declaratory relief; injunctive relief; reasonable attorneys' fees and costs under California Code of Civil Procedure § 1021.5; and other appropriate equitable relief.

# X. CLAIMS ON BEHALF OF THE ILLINOIS ACCOUNTS SUBCLASS

## COUNT IX
### Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA"), 815 Ill. Comp. Stat. 505/1, *et seq.*
### On Behalf of the Illinois Plaintiff and the Illinois Accounts Subclass

196.     Plaintiffs incorporate by reference all allegations of this complaint as though fully set forth herein, except those applying solely to the Credit Card Class.

197.     Plaintiff Robert Schak (the "Illinois Plaintiff") brings this Claim on behalf of himself and members of the Illinois Accounts Subclass.

198.     At all times relevant hereto, the Illinois Plaintiff, Illinois Subclass Members, and BoA were either natural persons or their legal representatives, partnerships, corporations, companies, trusts, business entities, or associations. 815 Ill. Comp. Stat. 505/1(c).

199.     The Illinois Plaintiff and Illinois Subclass Members are also consumers as defined in 815 Ill. Comp. Stat. 505/1(e).

200.     The ICFA prohibits "unfair or deceptive acts or practices . . . with intent that others rely upon the concealment, suppression or omission of such material fact . . . in the conduct of any trade or commerce[.]" 815 Ill. Comp. Stat. 505/2.

201.     Under the ICFA, "trade" or "commerce" is the "advertising, offering for sale, sale, or distribution of any services and any property, tangible or intangible, real, personal or mixed, and any another article, commodity, or thing of value wherever situated, and shall include any trade or commerce directly or indirectly affecting the people of this State." 815 Ill. Comp. Stat. 505/1(f).

202.     At all times relevant hereto, BoA engaged in the advertising, offering for sale, sale, and/or distribution of property and services, in the form of financial products and services.

203.     The Illinois Plaintiff and the Illinois Subclass Members purchased the products and services at issue herein for their use or that of members of their households.

204.    The ICFA, 815 Ill Comp. Stat. 505/1, *et seq.*, provides in pertinent part:

Unfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use or employment of any deception fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact, or the use or employment of any practice described in Section 2 of the "Uniform Deceptive Trade Practices Act", approved August 5, 1965, in the conduct of any trade or commerce are hereby declared unlawful whether any person has in fact been misled, deceived or damaged thereby.

205.    BoA, by and through its employees, agents, and/or servants, engaged in unlawful schemes and courses of conduct with regard to the sale and marketing of its Products by unfairly engaging in the following:

a.    Defendant opened bank accounts without the authorization and consent of the Illinois Plaintiff and the Illinois Subclass Members;

b.    Defendant failed to safeguard Illinois Plaintiff's and the Illinois Subclass Members' personal information and allowed employees to access such information to open unauthorized accounts;

c.    Defendant failed to implement adequate controls and conduct reasonable diligence, such as by verifying customer's identification and monitoring the opening of accounts with no or little activity, to prevent Illinois Plaintiff and the Illinois Subclass Members from having unauthorized accounts opened on their behalf;

d.    Defendant obtained consumer reports and submitted applications for Illinois Plaintiff and the Illinois Subclass Members without their authorization or consent. This conduct, with little if any utility, is unfair when weighed against the harm to Illinois Plaintiff and the Illinois Subclass Members, including harms in the form of fees charged and impacts to their credit reports;

e.    Defendant's design and implementation of an employee incentive compensation program that set unrealistic quotas of new accounts for BoA

employees to open, rewarded BoA employees for the sheer number of accounts it opened on behalf of Illinois Plaintiff and the Illinois Subclass Members, even if those accounts were opened without the authorization of Illinois Plaintiff and the Illinois Subclass Members, and punished BoA employees for failing to hit such quotas. Defendant's incentive program created a high-pressure environment where employees were pressured to open unauthorized accounts;

f.     Defendant failed to correct BoA employees who opened accounts without the authorization of Illinois Plaintiff and the Illinois Subclass, including through the deceptive, unfair conduct described above;

g.     Defendant failed to notify Illinois Plaintiff and Illinois Subclass Members that it opened unauthorized accounts on their behalf but without their consent, including through the deceptive, unfair conduct described above;

h.     Defendant charged Illinois Plaintiff and Illinois Subclass Members fees associated with the accounts that it opened without the authorization of Illinois Plaintiff and Illinois Subclass Members;

i.     Defendant failed to notify Illinois Plaintiff and Illinois Subclass Members that it charged them fees associated with the unauthorized accounts the Bank opened on their behalf but without their consent;

j.     Defendant misrepresented that BoA would comply with its obligations under federal law, including with the Fair Credit Reporting Act (15 U.S.C. § 1681) and Truth in Lending Act (15 U.S.C. § 1642; 12 C.F.R. § 1026.12(a)), as well as the Bank Secrecy Act and anti-money laundering regulations. Despite these representations, BoA failed to comply with these laws and it omitted, suppressed, and concealed that fact from Illinois Plaintiff and Illinois Subclass Members;

k.   Defendant's deceptive, unfair practices also led to substantial injuries, as described above, that are not outweighed by any countervailing benefits to consumers or competition. Moreover, because Illinois Plaintiff and Illinois Subclass Members could not know of Defendant's deceptive scheme to open unauthorized accounts and charge customers associated fees, including by obtaining consumer reports and using such reports to submit credit applications without the authorization of Illinois Plaintiff and Illinois Subclass Members, consumers could not have reasonably avoided the harms that Defendant caused;

l.   Defendant omitted, suppressed, and concealed the material facts described above to Illinois Plaintiff and Illinois Subclass Members; and

m.   Other ways to be discovered and proved at trial.

206.   BoA engaged in such unlawful course of conduct with the intent to induce the Illinois Plaintiff and Illinois Subclass Members to provide access to their consumer reports, to authorize opening new accounts, and to pay fees associated with such accounts.

207.   The fact that BoA misrepresented, concealed, suppressed, or omitted information regarding its purposes for obtaining and using customers' consumer reports, opening unauthorized new accounts, and charging fees associated with such accounts, as alleged above, was material in that statements from BoA employees regarding consumer reports, account opening and closing, and associated account fees is the type of information upon which a reasonable consumer is expected to rely in making a decision of whether to open or close an account, or pay fees associated with such accounts.

208.   BoA's acts or practices alleged herein offend the clearly stated public policy prohibiting such practices as set forth in the Electronic Funds Transfer Act (15 U.S.C. § 1693), Fair Credit Reporting Act (15 U.S.C. § 1681), and Truth in Lending Act (15 U.S.C. § 1642; 12 C.F.R. § 1026.12(a)).

209. BoA's acts or practices were likely to cause, and did cause, substantial injury to consumers as they resulted in BoA receiving revenue to which BoA is not entitled. The injuries caused by BoA's acts or practices, namely consumers' monetary losses, are not outweighed by any countervailing benefit to consumers or competition. BoA's unfair acts served no purpose other than to increase its own profits.

210. Defendant intended to mislead the Illinois Plaintiff and the Illinois Subclass Members and induce them to rely on their misrepresentations and material omissions of fact as alleged herein.

211. BoA's misconduct, including its misrepresentations and omission of material facts alleged herein, took place in connection with BoA's course of trade or commerce in Illinois, arose out of transactions that occurred in Illinois, and/or harmed individuals located in Illinois.

212. BoA intended for the Illinois Plaintiff and the Illinois Subclass Members to purchase its products and pay associated fees in reliance on BoA's unfair acts and/or practices.

213. Had Defendant disclosed to the Illinois Plaintiff and the Illinois Subclass Members that BoA employees had opened unauthorized accounts without the consent of Plaintiffs and the Class Members, Defendant would have been unable to continue incentivizing its employees to make new sales—which contribute significantly to BoA's profits—and it would have been forced to close accounts, refund fees en masse, and comply with the law. Accordingly, the Illinois Plaintiff and the Illinois Subclass Members acted reasonably in relying on Defendant's misrepresentations and material omissions of fact, the truth of which they could not have discovered.

214. The Illinois Plaintiff and the Illinois Subclass Members did not open the unauthorized accounts and those accounts would not have been opened, had BoA not misrepresented its purposes for obtaining and using customers' consumer reports and misrepresented the authorization or legitimacy of the phantom accounts opened.

215. The deceptive acts and/or practices of BoA violate the ICFA, 815 Ill. Comp. Stat. 505/2.

216. As a direct and proximate result of the unfair acts and/or practices of BoA, the Illinois Plaintiff and the Illinois Subclass Members were damaged in that they did not receive the benefit of their bargain and paid fees on accounts opened by BoA without authorization.

217. The Illinois Plaintiff and the Illinois Subclass Members request that this Court enjoin BoA from continuing to violate the ICFA as discussed herein. The Illinois Plaintiff and the Illinois Subclass Members also seek all damages permitted by law, including damage as a result of the unauthorized accounts appearing on their credit reports, damage to their credit score from a credit report being run to open the unauthorized credit card account, damages from fees associated with the unauthorized accounts, lost time and effort spent investigating the unauthorized account, reporting the issue to BoA, making sure it was corrected, and attempting to mitigate further harm, including harm to potential identity theft, the loss of control over personal identifying information, and payment for crediting monitoring and lock services.

## XI.  CLAIMS ON BEHALF OF THE MINNESOTA ACCOUNTS SUBCLASS

### COUNT X
**Minnesota Consumer Fraud Act ("MCFA"), Minn. Stat. §§ 325F.68, *et seq.* and Minn. Stat. §§ 8.31, *et seq.***
**On Behalf of the Minnesota Plaintiff and the Minnesota Accounts Subclass**

218. Plaintiffs incorporate by reference all allegations of this complaint as though fully set forth herein, except those applying solely to the Credit Card Class.

219. Plaintiff Gwenevere Alexander-Tell (the "Minnesota Plaintiff") brings this Claim on behalf of herself and members of the Minnesota Accounts Subclass.

220. BoA, Minnesota Plaintiff, and members of the Minnesota Accounts Subclass are each a "person" as defined by Minn. Stat. § 325F.68(3).

221. BoA's goods, services, commodities, and intangibles are "merchandise" as defined by Minn. Stat. § 325F.68(2).

222. BoA engaged in "sales" as defined by Minn. Stat. § 325F.68(4).

223.    BoA engaged in fraud, false pretense, false promise, misrepresentation, misleading statements, and deceptive practices in connection with the sale of merchandise, in violation of Minn. Stat. § 325F.69(1), including:

a.    Defendant opened bank accounts without the authorization and consent of the Minnesota Plaintiff and the Minnesota Subclass Members;

b.    Defendant failed to safeguard Minnesota Plaintiff's and the Minnesota Subclass Members' personal information and allowed employees to access such information to open unauthorized accounts;

c.    Defendant failed to implement adequate controls and conduct reasonable diligence, such as by verifying customer's identification and monitoring the opening of accounts with no or little activity, to prevent Minnesota Plaintiff and the Minnesota Subclass Members from having unauthorized accounts opened on their behalf;

d.    Defendant obtained consumer reports and submitted applications for Minnesota Plaintiff and the Minnesota Subclass Members without their authorization or consent. This conduct, with little if any utility, is unfair when weighed against the harm to Minnesota Plaintiff and the Minnesota Subclass Members, including harms in the form of fees charged and impacts to their credit reports;

e.    Defendant's design and implementation of an employee incentive compensation program that set unrealistic quotas of new accounts for BoA employees to open, rewarded BoA employees for the sheer number of accounts it opened on behalf of Minnesota Plaintiff and the Minnesota Subclass Members, even if those accounts were opened without the authorization of Minnesota Plaintiff and the Minnesota Subclass Members, and punished BoA employees for failing to hit such quotas. Defendant's

incentive program created a high-pressure environment where employees were pressured to open unauthorized accounts;

f.   Defendant failed to correct BoA employees who opened accounts without the authorization of Minnesota Plaintiff and the Minnesota Subclass, including through the deceptive, unfair conduct described above;

g.   Defendant failed to notify Minnesota Plaintiff and the Minnesota Subclass Members that it opened unauthorized accounts on their behalf but without their consent, including through the deceptive, unfair conduct described above;

h.   Defendant charged Minnesota Plaintiff and the Minnesota Subclass Members fees associated with the accounts that it opened without the authorization of Minnesota Plaintiff and Minnesota Subclass Members;

i.   Defendant failed to notify Minnesota Plaintiff and the Minnesota Subclass Members that it charged them fees associated with the unauthorized accounts the Bank opened on their behalf but without their consent;

j.   Defendant misrepresented that BoA would comply with its obligations under federal law, including with the Fair Credit Reporting Act (15 U.S.C. § 1681) and Truth in Lending Act (15 U.S.C. § 1642; 12 C.F.R. § 1026.12(a)), as well as the Bank Secrecy Act and anti-money laundering regulations. Despite these representations, BoA failed to comply with these laws and it omitted, suppressed, and concealed that fact from Minnesota Plaintiff and the Minnesota Subclass Members;

k.   Defendant's deceptive, unfair practices also led to substantial injuries, as described above, that are not outweighed by any countervailing benefits to consumers or competition. Moreover, because Minnesota Plaintiff and the Minnesota Subclass Members could not know of Defendant's deceptive

scheme to open unauthorized accounts and charge customers associated fees, including by obtaining consumer reports and using such reports to submit credit applications without the authorization of Minnesota Plaintiff and the Minnesota Subclass Members, consumers could not have reasonably avoided the harms that Defendant caused;

l. Defendant omitted, suppressed, and concealed the material facts described above to Minnesota Plaintiff and the Minnesota Subclass Members; and

m. Other ways to be discovered and proved at trial.

224. BoA's representations and omissions were material because they were likely to deceive reasonable consumers about the purpose for obtaining consumer reports, the submission of applications for unauthorized accounts without the consent of Minnesota Plaintiff and the Minnesota Subclass Members, the opening of unauthorized accounts without the consent of Minnesota Plaintiff and the Minnesota Subclass Members, and the charging of fees associated with unauthorized accounts opened without the consent of Minnesota Plaintiff and the Minnesota Subclass Members.

225. Defendant intended to mislead Minnesota Plaintiff and the Minnesota Subclass Members and induce them to rely on their misrepresentations and material omissions of fact as alleged herein.

226. Had Defendant disclosed to Minnesota Plaintiff and the Minnesota Subclass Members that BoA employees had opened unauthorized accounts with the consent of Minnesota Plaintiff and the Minnesota Subclass Members, Defendant would have been unable to continue incentivizing its employees to make new sales—which contribute significantly to the Bank's profits—and it would have been forced to close accounts, refund fees en masse, and comply with the law. Accordingly, Minnesota Plaintiff and the Minnesota Subclass Members acted reasonably in relying on Defendant's misrepresentations and material omissions of fact, the truth of which they could not have discovered.

227.     Defendant acted intentionally, knowingly, and maliciously to violate MCFA, and recklessly disregarded Minnesota Plaintiff's and the Minnesota Subclass Members' rights.

228.     As a direct and proximate result of Defendant's unfair, unlawful, and fraudulent acts and practices, Minnesota Plaintiff and the Minnesota Subclass Members have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages as described herein and as will be proved at trial, including damage as a result of the unauthorized accounts appearing on their credit reports, damage to their credit score from a credit report being run to open the unauthorized credit card account, damages from fees associated with the unauthorized accounts, lost time and effort spent investigating the unauthorized account, reporting the issue to BoA, making sure it was corrected, and attempting to mitigate further harm, including harm to potential identity theft, the loss of control over personal identifying information, and payment for crediting monitoring and lock services.

229.     Minnesota Plaintiff and Minnesota Subclass Members seek all monetary and non-monetary relief allowed by law, including damages; injunctive or other equitable relief; and attorneys' fees, disbursements, and costs.

## COUNT XI
**Minnesota Uniform Deceptive Trade Practices Act ("MUDTPA"), Minn. Stat. §§ 325D.43,**
*et seq.*
**On Behalf of the Minnesota Plaintiff and the Minnesota Accounts Subclass**

230.     Plaintiffs incorporate by reference all allegations of this complaint as though fully set forth herein, except those applying solely to the Credit Card Class.

231.     Plaintiff Gwenevere Alexander-Tell (the "Minnesota Plaintiff") brings this Claim on behalf of herself and members of the Minnesota Accounts Subclass.

232.     By engaging in deceptive trade practices in the course of its business and vocation, directly or indirectly affecting the people of Minnesota, BoA violated Minn. Stat. § 325D.44, including the following provisions:

      a.     Representing that its goods and services had characteristics, uses, and benefits that they did not have, in violation of Minn. Stat. § 325D.44(1)(5);

b.    Representing that goods and services are of a particular standard or quality when they are of another, in violation of Minn. Stat. § 325D.44(1)(7);

c.    Advertising goods and services with intent not to sell them as advertised, in violation of Minn. Stat. § 325D.44(1)(9); and

d.    Engaging in other conduct which similarly creates a likelihood of confusion or misunderstanding, in violation of Minn. Stat. § 325D.44(1)(13).

233.    BoA's deceptive practices include:

a.    Defendant opened bank accounts without the authorization and consent of the Minnesota Plaintiff and the Minnesota Subclass Members;

b.    Defendant failed to safeguard Minnesota Plaintiff's and the Minnesota Subclass Members' personal information and allowed employees to access such information to open unauthorized accounts;

c.    Defendant failed to implement adequate controls and conduct reasonable diligence, such as by verifying customer's identification and monitoring the opening of accounts with no or little activity, to prevent Minnesota Plaintiff and the Minnesota Subclass Members from having unauthorized accounts opened on their behalf;

d.    Defendant obtained consumer reports and submitted applications for Minnesota Plaintiff and the Minnesota Subclass Members without their authorization or consent. This conduct, with little if any utility, is unfair when weighed against the harm to Minnesota Plaintiff and the Minnesota Subclass Members, including harms in the form of fees charged and impacts to their credit reports;

e.    Defendant's design and implementation of an employee incentive compensation program that set unrealistic quotas of new accounts for BoA employees to open, rewarded BoA employees for the sheer number of

accounts it opened on behalf of Minnesota Plaintiff and the Minnesota Subclass Members, even if those accounts were opened without the authorization of Minnesota Plaintiff and the Minnesota Subclass Members, and punished BoA employees for failing to hit such quotas. Defendant's incentive program created a high-pressure environment where employees were pressured to open unauthorized accounts;

f.    Defendant failed to correct BoA employees who opened accounts without the authorization of Minnesota Plaintiff and the Minnesota Subclass, including through the deceptive, unfair conduct described above;

g.    Defendant failed to notify Minnesota Plaintiff and the Minnesota Subclass Members that it opened unauthorized accounts on their behalf but without their consent, including through the deceptive, unfair conduct described above;

h.    Defendant charged Minnesota Plaintiff and the Minnesota Subclass Members fees associated with the accounts that it opened without the authorization of Minnesota Plaintiff and the Minnesota Subclass Members;

i.    Defendant failed to notify Minnesota Plaintiff and the Minnesota Subclass Members that it charged them fees associated with the unauthorized accounts the Bank opened on their behalf but without their consent;

j.    Defendant misrepresented that BoA would comply with its obligations under federal law, including with the Fair Credit Reporting Act (15 U.S.C. § 1681) and Truth in Lending Act (15 U.S.C. § 1642; 12 C.F.R. § 1026.12(a)), as well as the Bank Secrecy Act and anti-money laundering regulations. Despite these representations, BoA failed to comply with these laws and it omitted, suppressed, and concealed that fact from Minnesota Plaintiff and the Minnesota Subclass Members;

k.  Defendant's deceptive, unfair practices also led to substantial injuries, as described above, that are not outweighed by any countervailing benefits to consumers or competition. Moreover, because Minnesota Plaintiff and the Minnesota Subclass Members could not know of Defendant's deceptive scheme to open unauthorized accounts and charge customers associated fees, including by obtaining consumer reports and using such reports to submit credit applications without the authorization of Minnesota Plaintiff and the Minnesota Subclass Members, consumers could not have reasonably avoided the harms that Defendant caused;

l.  Defendant omitted, suppressed, and concealed the material facts described above to Minnesota Plaintiff and the Minnesota Subclass Members; and

m.  Other ways to be discovered and proved at trial.

234.  BoA's representations and omissions were material because they were likely to deceive reasonable consumers about the purpose for obtaining consumer reports, the submission of applications for unauthorized accounts without the consent of Minnesota Plaintiff and the Minnesota Subclass Members, the opening of unauthorized accounts without the consent of Minnesota Plaintiff and the Minnesota Subclass Members, and the charging of fees associated with unauthorized accounts opened without the consent of Minnesota Plaintiff and the Minnesota Subclass Members.

235.  Defendant intended to mislead Minnesota Plaintiff and the Minnesota Subclass Members and induce them to rely on their misrepresentations and material omissions of fact as alleged herein.

236.  Had Defendant disclosed to Minnesota Plaintiff and the Minnesota Subclass Members that BoA employees had opened unauthorized accounts with the consent of Minnesota Plaintiff and the Minnesota Subclass Members, Defendant would have been unable to continue incentivizing its employees to make new sales—which contribute significantly to the Bank's

profits—and it would have been forced to close accounts, refund fees en masse, and comply with the law. Accordingly, Minnesota Plaintiff and the Minnesota Subclass Members acted reasonably in relying on Defendant's misrepresentations and material omissions of fact, the truth of which they could not have discovered.

237. Defendant acted intentionally, knowingly, and maliciously to violate the MUDTPA and recklessly disregarded Minnesota Plaintiffs' and the Minnesota Subclass Members' rights.

238. As a direct and proximate result of Defendant's unfair, unlawful, and fraudulent acts and practices, Minnesota Plaintiff and the Minnesota Subclass Members have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages as described herein and as will be proved at trial, including damage as a result of the unauthorized accounts appearing on their credit reports, damage to their credit score from a credit report being run to open the unauthorized credit card accounts, damages from fees associated with the unauthorized accounts, lost time and effort spent investigating the unauthorized accounts, reporting the issues to BoA, trying to make sure they were corrected, and attempting to mitigate further harm, including harm to potential identity theft, the loss of control over personal identifying information, and payment for crediting monitoring and lock services.

239. Minnesota Plaintiffs and the Minnesota Subclass Members seek all monetary and non-monetary relief allowed by law, including injunctive relief and reasonable attorneys' fees and costs.

## XII. CLAIMS ON BEHALF OF THE NEW JERSEY ACCOUNTS SUBCLASS

### <u>COUNT XII</u>
**New Jersey Unfair Trade Practices Act ("NJUTPA"), N.J. Stat. Ann. §§ 56:8-1, *et seq.***
**On Behalf of the New Jersey Plaintiff and the New Jersey Accounts Subclass**

240. Plaintiffs incorporate by reference all allegations of this complaint as though fully set forth herein, except those applying solely to the Credit Card Class.

241. Plaintiff Joseph Barlay (the "New Jersey Plaintiff") brings this Claim on behalf of himself and members of the New Jersey Accounts Subclass.

242. BoA is a "person," as defined by N.J. Stat. Ann. § 56:8-1(d).

243. BoA sells "merchandise," as defined by N.J. Stat. Ann. § 56:8-1(c) & (e).

244. The New Jersey Consumer Fraud Act, N.J. Stat. §§ 56:8-1, *et seq.*, prohibits unconscionable commercial practices, deception, fraud, false pretense, false promise, misrepresentation, as well as the knowing concealment, suppression, or omission of any material fact with the intent that others rely on the concealment, omission, or fact, in connection with the sale or advertisement of any merchandise.

245. BoA's unconscionable and deceptive practices include:

a. Defendant opened bank accounts without the authorization and consent of the New Jersey Plaintiff and the New Jersey Subclass Members;

b. Defendant failed to safeguard New Jersey Plaintiff's and the New Jersey Subclass Members' personal information and allowed employees to access such information to open unauthorized accounts;

c. Defendant failed to implement adequate controls and conduct reasonable diligence, such as by verifying customer's identification and monitoring the opening of accounts with no or little activity, to prevent New Jersey Plaintiff and the New Jersey Subclass Members from having unauthorized accounts opened on their behalf;

d. Defendant obtained consumer reports and submitted applications for New Jersey Plaintiff and the New Jersey Subclass Members without their authorization or consent. This conduct, with little if any utility, is unfair when weighed against the harm to New Jersey Plaintiff and the New Jersey Subclass Members, including harms in the form of fees charged and impacts to their credit reports;

e. Defendant's design and implementation of an employee incentive compensation program that set unrealistic quotas of new accounts for BoA

employees to open, rewarded BoA employees for the sheer number of accounts it opened on behalf of New Jersey Plaintiff and the New Jersey Subclass Members, even if those accounts were opened without the authorization of New Jersey Plaintiff and the New Jersey Subclass Members, and punished BoA employees for failing to hit such quotas. Defendant's incentive program created a high-pressure environment where employees were pressured to open unauthorized accounts;

f.   Defendant failed to correct BoA employees who opened accounts without the authorization of New Jersey Plaintiff and the New Jersey Subclass, including through the deceptive, unfair conduct described above;

g.   Defendant failed to notify New Jersey Plaintiff and the New Jersey Subclass Members that it opened unauthorized accounts on their behalf but without their consent, including through the deceptive, unfair conduct described above;

h.   Defendant charged New Jersey Plaintiff and the New Jersey Subclass Members fees associated with the accounts that it opened without the authorization of Plaintiffs and the New Jersey Subclass Members;

i.   Defendant failed to notify New Jersey Plaintiff and the New Jersey Subclass Members that it charged them fees associated with the unauthorized accounts the Bank opened on their behalf but without their consent;

j.   Defendant misrepresented that BoA would comply with its obligations under federal law, including with the Fair Credit Reporting Act (15 U.S.C. § 1681) and Truth in Lending Act (15 U.S.C. § 1642; 12 C.F.R. § 1026.12(a)), as well as the Bank Secrecy Act and anti-money laundering regulations. Despite these representations, BoA failed to comply with these laws and it omitted,

suppressed, and concealed that fact from New Jersey Plaintiff and the New Jersey Subclass Members;

k. Defendant's deceptive, unfair practices also led to substantial injuries, as described above, that are not outweighed by any countervailing benefits to consumers or competition. Moreover, because New Jersey Plaintiff and the New Jersey Subclass Members could not know of Defendant's deceptive scheme to open unauthorized accounts and charge customers associated fees, including by obtaining consumer reports and using such reports to submit credit applications without the authorization of New Jersey Plaintiff and the New Jersey Subclass, consumers could not have reasonably avoided the harms that Defendant caused;

l. Defendant omitted, suppressed, and concealed the material facts described above to New Jersey Plaintiff and the New Jersey Subclass; and

m. Other ways to be discovered and proved at trial.

246. BoA's representations and omissions were material because they were likely to deceive reasonable consumers about the purpose for obtaining consumer reports, the submission of applications for unauthorized accounts without the consent of New Jersey Plaintiff and the New Jersey Subclass, the opening of unauthorized accounts without the consent of New Jersey Plaintiff and the New Jersey Subclass, and the charging of fees associated with unauthorized accounts opened without the consent of New Jersey Plaintiff and the New Jersey Subclass.

247. Defendant intended to mislead New Jersey Plaintiff and the New Jersey Subclass and induce them to rely on their misrepresentations and material omissions of fact as alleged herein.

248. Had Defendant disclosed to New Jersey Plaintiff and the New Jersey Subclass that BoA employees had opened unauthorized accounts with the consent of New Jersey Plaintiff and the New Jersey Subclass, Defendant would have been unable to continue incentivizing its

employees to make new sales—which contribute significantly to the Bank's profits—and it would have been forced to close accounts, refund fees en masse, and comply with the law. Accordingly, New Jersey Plaintiff and the New Jersey Subclass Members acted reasonably in relying on Defendant's misrepresentations and material omissions of fact, the truth of which they could not have discovered.

249.    Defendant acted intentionally, knowingly, and maliciously to violate the NJUTPA, and recklessly disregarded New Jersey Plaintiff's and the New Jersey Subclass Members' rights.

250.    As a direct and proximate result of Defendant's unfair, unlawful, and fraudulent acts and practices, New Jersey Plaintiff and the New Jersey Subclass have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages as described herein and as will be proved at trial, including damage as a result of the unauthorized accounts appearing on their credit reports, damage to their credit score from a credit report being run to open the unauthorized credit card account, damages from fees associated with the unauthorized accounts, lost time and effort spent investigating the unauthorized account, reporting the issue to BoA, making sure it was corrected, and attempting to mitigate further harm, including harm to potential identity theft, the loss of control over personal identifying information, and payment for crediting monitoring and lock services.

251.    New Jersey Plaintiff and the New Jersey Subclass seek all monetary and non-monetary relief allowed by law, including restitution of all profits stemming from Defendant's unfair, unlawful, and fraudulent business practices; declaratory relief; injunctive relief; reasonable attorneys' fees and costs; and other appropriate equitable relief.

## XIII.    CLAIMS ON BEHALF OF THE NEVADA ACCOUNTS SUBCLASS
### COUNT XIII
**Nevada Deceptive Trade Practices Act ("NDTPA"), Nev. Rev. Stat. Ann. §§ 598.0903,**
*et seq.*
**On Behalf of Nevada Plaintiffs and the Nevada Accounts Subclass**

252.    Plaintiffs incorporate by reference all allegations of this complaint as though fully set forth herein, except those applying solely to the Credit Card Class.

253. Plaintiff Octavio Ayala and Marvel Pamilton (the "Nevada Plaintiffs") bring this Claim on behalf of themselves and members of the Nevada Accounts Subclass.

254. BoA advertised, offered, or sold goods or services in Nevada and engaged in trade or commerce directly or indirectly affecting the people of Nevada.

255. BoA engaged in deceptive trade practices in the course of its business or occupation, in violation of Nev. Rev. Stat. §§ 598.0915 and 598.0923, including:

   a. Knowingly making a false representation as to the characteristics, uses, and benefits of goods or services for sale in violation of Nev. Rev. Stat. § 598.0915(5);

   b. Representing that goods or services for sale are of a particular standard, quality, or grade when BoA knew or should have known that they are of another standard, quality, or grade in violation of Nev. Rev. Stat. § 598.0915(7);

   c. Advertising goods or services with intent not to sell them as advertised in violation of Nev. Rev. Stat § 598.0915(9);

   d. Failing to disclose a material fact in connection with the sale of goods or services in violation of Nev. Rev. Stat. § 598.0923(A)(2); and

   e. Violating state and federal statutes or regulations relating to the sale of goods or services in violation of Nev. Rev. Stat. § 598.0923(A)(3).

256. BoA's deceptive trade practices in the course of its business or occupation include:

   a. Defendant opened bank accounts without the authorization and consent of the Nevada Plaintiffs and the Nevada Subclass Members;

   b. Defendant failed to safeguard Nevada Plaintiffs' and the Nevada Subclass Members' personal information and allowed employees to access such information to open unauthorized accounts;

c.  Defendant failed to implement adequate controls and conduct reasonable diligence, such as by verifying customer's identification and monitoring the opening of accounts with no or little activity, to prevent Nevada Plaintiffs and the Nevada Subclass Members from having unauthorized accounts opened on their behalf;

d.  Defendant obtained consumer reports and submitted applications for Nevada Plaintiffs and the Nevada Subclass Members without their authorization or consent. This conduct, with little if any utility, is unfair when weighed against the harm to Nevada Plaintiffs and the Nevada Subclass Members, including harms in the form of fees charged and impacts to their credit reports;

e.  Defendant's design and implementation of an employee incentive compensation program that set unrealistic quotas of new accounts for BoA employees to open, rewarded BoA employees for the sheer number of accounts it opened on behalf of Nevada Plaintiffs and the Nevada Subclass Members, even if those accounts were opened without the authorization of Nevada Plaintiffs and the Nevada Subclass Members, and punished BoA employees for failing to hit such quotas. Defendant's incentive program created a high-pressure environment where employees were pressured to open unauthorized accounts;

f.  Defendant failed to correct BoA employees who opened accounts without the authorization of Nevada Plaintiffs and the Nevada Subclass Members, including through the deceptive, unfair conduct described above;

g.  Defendant failed to notify Nevada Plaintiffs and the Nevada Subclass Members that it opened unauthorized accounts on their behalf but without their consent, including through the deceptive, unfair conduct described above;

h.  Defendant charged Nevada Plaintiffs and the Nevada Subclass Members fees associated with the accounts that it opened without the authorization of Nevada Plaintiffs and the Nevada Subclass Members;

i.  Defendant failed to notify Nevada Plaintiffs and the Nevada Subclass Members that it charged them fees associated with the unauthorized accounts the Bank opened on their behalf but without their consent;

j.  Defendant misrepresented that BoA would comply with its obligations under federal law, including with the Fair Credit Reporting Act (15 U.S.C. § 1681) and Truth in Lending Act (15 U.S.C. § 1642; 12 C.F.R. § 1026.12(a)), as well as the Bank Secrecy Act and anti-money laundering regulations. Despite these representations, BoA failed to comply with these laws and it omitted, suppressed, and concealed that fact from Nevada Plaintiffs and the Nevada Subclass Members;

k.  Defendant's deceptive, unfair practices also led to substantial injuries, as described above, that are not outweighed by any countervailing benefits to consumers or competition. Moreover, because Nevada Plaintiffs and the Nevada Subclass Members could not know of Defendant's deceptive scheme to open unauthorized accounts and charge customers associated fees, including by obtaining consumer reports and using such reports to submit credit applications without the authorization of Nevada Plaintiffs and the Nevada Subclass Members, consumers could not have reasonably avoided the harms that Defendant caused;

l.  Defendant omitted, suppressed, and concealed the material facts described above to Nevada Plaintiffs and the Nevada Subclass Members; and

m.  Other ways to be discovered and proved at trial.

257.     BoA's representations and omissions were material because they were likely to deceive reasonable consumers about the purpose for obtaining consumer reports, the submission of applications for unauthorized accounts without the consent of Nevada Plaintiffs and the Nevada Subclass Members, the opening of unauthorized accounts without the consent of Nevada Plaintiffs and the Nevada Subclass Members, and the charging of fees associated with unauthorized accounts opened without the consent of Nevada Plaintiffs and the Nevada Subclass Members.

258.     Defendant intended to mislead Nevada Plaintiffs and the Nevada Subclass Members and induce them to rely on their misrepresentations and material omissions of fact as alleged herein.

259.     Had Defendant disclosed to Nevada Plaintiffs and the Nevada Subclass Members that BoA employees had opened unauthorized accounts with the consent of the Nevada Plaintiffs and the Nevada Subclass Members, Defendant would have been unable to continue incentivizing its employees to make new sales—which contribute significantly to the Bank's profits—and it would have been forced to close accounts, refund fees en masse, and comply with the law. Accordingly, Nevada Plaintiffs and the Nevada Subclass Members acted reasonably in relying on Defendant's misrepresentations and material omissions of fact, the truth of which they could not have discovered.

260.     Defendant acted intentionally, knowingly, and maliciously to violate the NDTPA, and recklessly disregarded Nevada Plaintiffs' and the Nevada Subclass Members' rights.

261.     As a direct and proximate result of Defendant's unfair, unlawful, and fraudulent acts and practices, Nevada Plaintiffs and the Nevada Subclass Members have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages as described herein and as will be proved at trial, including damage as a result of the unauthorized accounts appearing on their credit reports, damage to their credit score from a credit report being run to open the unauthorized credit card account, damages from fees associated with the unauthorized accounts, lost time and effort spent investigating the unauthorized account,

reporting the issue to BoA, making sure it was corrected, and attempting to mitigate further harm, including harm to potential identity theft, the loss of control over personal identifying information, and payment for crediting monitoring and lock services.

886. Nevada Plaintiffs and the Nevada Subclass Members seek all monetary and non-monetary relief allowed by law, including damages, restitution, punitive damages, and attorneys' fees and costs.

## XIV.     PRAYER FOR RELIEF

262. WHEREFORE, Plaintiffs, on behalf of themselves and all others similarly situated, requests that the Court enter judgment in his favor and against Defendant, as follows:

a) For an order certifying the Classes and, under Federal Rules of Civil Procedure 23(b)(2) and 23(b)(3), appointing Plaintiffs as Class Representatives and appointing the lawyers and law firms representing Plaintiffs as counsel for the Class;

b) Declaring BoA's actions to be false, misleading, and/or deceptive;

c) Permanently enjoining BoA from performing further unfair and unlawful acts as alleged herein;

d) For all recoverable compensatory, statutory, and other damages sustained by Plaintiffs and the Class, including disgorgement, unjust enrichment, and all other relief allowed under applicable law;

e) Awarding Plaintiffs and the Class appropriate relief, including actual and statutory damages, restitution, disgorgement, and punitive damages;

f) Awarding equitable, injunctive, and declaratory relief as may be appropriate;

g) Awarding all costs, including experts' fees and attorneys' fees, as well as the costs of prosecuting this action;

h) Awarding pre-judgment and post-judgment interest as prescribed by law; and

i) Granting such other and further relief as the Court may deem just and proper.

## XV. DEMAND FOR JURY TRIAL

263.     Plaintiffs, on behalf of himself and all others similarly situated, hereby demands a trial by jury on all the issues so triable.

Dated: October 4, 2024

By: */s/ Gary Jackson*
Gary W. Jackson NC Bar No. 13976
Thomas M. Wilmoth NC Bar No. 41684
**LAW OFFICES OF JAMES SCOTT
FARRIN**
555 South Mangum Street, Suite 800
Durham, NC 27284
Tel: (919) 688-4991
gjackson@farrin.com
twilmoth@farrin.com

*Interim Liaison Counsel for Plaintiffs and the
putative class*

Lesley E. Weaver (*admitted pro hac vice*)
Anne K. Davis (*admitted pro hac vice*)
Joshua D. Samra (*admitted pro hac vice*)
**BLEICHMAR FONTI & AULD LLP**
1330 Broadway, Suite 630
Oakland, CA 94612
Tel.: (415) 445-4003
Fax: (415) 445-4020
lweaver@bfalaw.com
adavis@bfalaw.com
jsamra@bfalaw.com

Gregory S. Mullens (*pro hac vice forthcoming*)
**BLEICHMAR FONTI & AULD LLP**
75 Virginia Road, 2nd Floor
White Plains, New York 10603
Tel.: (415) 445-4006
gmullens@bfalaw.com

Hassan Zavareei (admitted *pro hac vice*)
Andrea R. Gold (admitted *pro hac vice*)
Gemma Seidita (admitted *pro hac vice*)
**TYCKO & ZAVAREEI LLP**

2000 Pennsylvania Avenue NW, Suite 1010
Washington, District of Columbia 20006
Telephone: (202) 919-5852
Facsimile: (202) 973-0950
agold@tzlegal.com
hzavareei@tzlegal.com
gseidita@tzlegal.com

Cort Carlson (admitted *pro hac vice*)
**TYCKO & ZAVAREEI LLP**
1970 Broadway, Suite 1070
Oakland, California 94612
Telephone: (510) 254-6808
Facsimile: (202) 973-0950
ccarlson@tzlegal.com

Daniel E. Gustafson (admitted *pro hac vice*)
Abou B. Amara, Jr. (admitted *pro hac vice*)
**GUSTAFSON GLUEK PLLC**
120 South Sixth Street, Suite 2600
Minneapolis, MN 55402
Phone: 612-333-8844
dgustafson@gustafsongluek.com
aamara@gustafsongluek.com

Jennifer S. Czeisler (admitted *pro hac vice*)
**STERLINGTON PLLC**
One World Trade Center, 85th Floor
New York, NY 10007
Tel: (212) 433-2993
jen.czeisler@sterlingtonlaw.com

Charles E. Schaffer (admitted *pro hac vice*)
Daniel C. Levin*
Pennsylvania Bar No. 80013
**LEVIN SEDRAN & BERMAN LLP**
510 Walnut Street, Suite 500
Philadelphia, PA 19106
Tel: (215) 592-1500
cschaffer@lfsblaw.com
dlevin@lfsblaw.com

*Interim Co-Lead Class Counsel for Plaintiffs
and the putative class*